[L. A. No. 24459.   In Bank.   June 21, 1957.]

MARTIN SCHOOL OF AVIATION, INC. (a Corporation), Appellant, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Association), as Executor, etc., Respondent.

Winthrop O. Gordon and Nathan W. Tarr for Appellant.

William J. Cusack for Respondent.

McCOMB, J.—From a judgment in favor of defendant after trial before the court in an action to recover damages for the destruction of its airplane, plaintiff appeals.

*Facts*: Plaintiff, Martin School of Aviation, Inc., a corporation, sues as assignee of a partnership consisting of Floyd R. Martin, Joseph G. Hager and J. W. Martin, Jr., which had been doing business under the firm name of Martin School of Aviation. Defendant is sued as executor of the estate of Charles E. Rhoades, deceased. Hereafter the partnership will be referred to as plaintiff and decedent Rhoades as defendant.

Plaintiff owned an instrument-equipped Bonanza airplane which it rented to defendant for a flight to the Imperial Valley. Arrangements were made for defendant by O. A. Kier, an experienced and competent pilot, who acted as pilot of the plane. Within three minutes after the flight commenced the plane crashed. Defendant, the pilot and C. O. Gregg, all occupants of the plane, were killed.

The amended complaint in three counts alleges: (1) that the bailment was made to defendant upon condition that "they would not take, or cause said plane to be taken, off from the ground until after daybreak and unless the weather was clear"; that the plane took off before daybreak and before the weather was clear, and that it was so negligently operated as to cause it to crash to the ground; (2) after incorporating by reference the averments as to the terms of the rental conditions, that defendant "failed to return said airplane to plaintiffs in violation of their said agreement of bailment, and wrongfully breached said agreement of bailment to plaintiffs' damage"; and (3) after incorporating the previous averments of the terms of the bailment, that defendant "promised to return said airplane in good condition and wilfully and negligently failed and refused to return said airplane to plaintiffs and converted the same to his own use."

The trial court found that:

(a) Defendant and Pilot Kier agreed that they would not take or cause said plane to be taken from the ground if the weather was not good;

(b) Defendant and Pilot Kier did not agree that the plane would not be taken from the ground "until after daybreak";

(c) When the flight started "the weather was good at that time";

(d) The plane was not operated negligently;

(e) The terms of the bailment were not breached; and

(f) There was no conversion.

*Questions:* First. *Was there substantial evidence to support the trial court's findings* (a), (b), (c) *and* (d), *supra?*

■ This question must be answered in the affirmative, and is governed by this rule: When findings of fact are attacked on the ground that there is not any substantial evidence to sustain them, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the findings of fact. (*Primm* v. *Primm,* 46 Cal.2d 690, 693 [1] [299 P.2d 231].)

Applying this rule to the present case, a recital of a portion of the evidence with reference to each of the questioned findings discloses substantial evidence to support them:

■ *Findings* (a) *and* (b). John Martin, a man experienced in aviation matters and in investigating accidents with the Civil Aeronautics Authority, on the day of the accident filed a report with the C.A.A. which was received in evidence. The material portion reads: "Mr. Rhoades and Red Kier made arrangements to use our Bonanza N8632A to go to Brawley, California, on a dove hunting trip and wanted to leave and return early in order to get the hunting over before it got too hot in Brawley. *Kier told me he would check the weather before leaving and wouldn't go if the weather was not good.* I was called at home about 5:45 a. m. by my brother and he said the airport guard called and said that he thought Kier had cracked up. I left at once for the scene of the accident and found it was a complete washout and was not anything left of value. All three persons in the airplane were killed. *It is impossible for me to figure out what could have caused this accident as the ship went in at a great speed and nearly straight in.* The only information I have is what people in the vicinity had to say." (Italics added.)

Clearly, the italicized portion of Mr. Martin's statement and the absence of any other evidence as to weather conditions before the plane was taken into the air constituted substantial evidence to sustain the trial court's questioned findings (a) and (b). ■ Conflicting evidence and inferences must, of course, be disregarded by this court. (See *Primm* v. *Primm, supra,* p. 694 [2].)

■ *Finding* (c). The evidence established that at the time of takeoff there was a cloud bank above the airfield and surrounding area, with the ceiling being somewhere between

200 and 1,000 feet. The official weather reports placed the ceiling at about 800 feet. Horizontal visibility was estimated at from one to seven miles, and there was no fog. The top of the cloud layer was approximately 2,000 feet, and above that level the skies were clear and visibility unrestricted.

The following Air Traffic Control Regulations (Code of Federal Regulations, tit. 14, pt. 60) apply to intrastate as well as interstate flights and prescribe, among other things, minimum safe altitudes and rules for visual and instrument flights with respect to ceilings and cloud formations:

Section 60.17 prescribes minimum safe altitudes. So far as pertinent here it reads: *"Minimum safe altitudes.* Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes: . . . (b) *Over congested areas.* Over the congested areas of cities, towns or settlements, or over an open-air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft. . . . (c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In such event, the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure. . . . (d) *IFR operations.* The minimum IFR altitude established by the Administrator for that portion of the route over which the operation is conducted. . . ."

The Visual Flight Rules are prescribed by section 60.30, which read: *"Ceiling and distance from clouds.* Aircraft shall comply with the following requirements as to ceiling and distance from clouds: (a) *Within control zones.* Unless authorized by air traffic control, aircraft shall not be flown when the ceiling is less than 1,000 feet, or less than 500 feet vertically and 2,000 feet horizontally from any cloud formation. (b) *Elsewhere.* When at an altitude of more than 700 feet above the surface aircraft shall not be flown less than 500 feet vertically and 2,000 feet horizontally from any cloud formation; when at an altitude of 700 feet or less aircraft shall not be flown unless clear of clouds."

Ceiling is defined in section 60.72: *"Ceiling.* The distance from the surface of the ground or water to the lowest cloud layer reported as 'broken clouds' or 'overcast.' "

"IFR" means instrument flight rules (§ 60.82), and "IFR conditions" are defined as: "Weather conditions below the minimum prescribed for flights under VFR." (§ 60.83.) "VFR conditions" are defined as: "Weather conditions equal

to or above the minimum prescribed for flights under VFR."
(§ 60.89.)

Section 60.41 reads: *"IFR flight plan.* Prior to take-off
from a point within a control zone or prior to entering a
control area or control zone, a flight plan shall be filed with
air traffic control. . . ."

It is to be noted that there was no evidence that the path of
flight was to go through congested areas within the meaning
of the Visual Flight Rules. If the ceiling was 800 to 1,000
feet the airplane could fly at an altitude up to 700 feet and
still comply with those rules if no control zones or congested
areas were involved.

It is not necessary for visual flight conditions to prevail
in order that the flying weather be "good." There is a
difference between "good" weather and "clear" weather in
this regard. "In 'clear weather,' when the pilots can navi-
gate their planes by 'pilotage,' that is, by visual operation
from markings and landmarks along the airways, and can
clearly see other aircraft or obstructions in time to avoid
collision, flights may be governed by the Visual Flight Rules."
(Wilson & Bryan, Air Transportation (1949), p. 160.) It
may be "good" flight weather even though it is not "clear"
within this definition.

In the instant case the sky was clear above 2,000 feet, there
was no evidence of any frontal activity or local turbulence in
the air, and the only possibly unfavorable weather condition
was the cloud bank of about 1,200 foot depth. The pilot was
an experienced instrument flyer, and a bank of stratus at such
a ceiling is not bad weather for an instrument-rated pilot in
an instrument-equipped plane. Thus, even if visual flying
conditions did not prevail, there was no showing that the pilot
did not comply with the Instrument Flight Rules or that the
weather was not "good" for an instrument flight. Under
these circumstances it cannot be said as a matter of law
that it was not "good" flying weather, and the foregoing
evidence fully sustains the trial court's finding (c).

▮ *Finding (d).* There is a total absence of any evidence
that defendant was negligent, or that the terms of the bail-
ment were breached, or that there was a conversion. The
trial court's finding on these points is sustained by Mr.
Martin's report to the C.A.A. set forth above, wherein he
said, "It is impossible for me to figure out what could have
caused this accident as the ship went in at a great speed and
nearly straight in."

██ Second: *Did the trial court abuse its discretion in denying plaintiff's motion for a new trial?*

*No.* Plaintiff contends that it was surprised and misled by the court into not introducing certain evidence. During the argument at the close of the trial the judge expressed the opinion that the bailment contract contained a condition as to daylight departure and that the condition was violated. The court then, on its own motion, reopened the case for further evidence on the issue of visibility and the meaning of the word "daylight."

The record shows that plaintiff had ample opportunity to introduce its evidence prior to submission of the case, as the judge made clear his willingness to hear any evidence offered, and additional evidence regarding the terms of the bailment contract was actually introduced. The case was twice continued for further evidence, and after submission the trial court made the findings set forth above.

██ The findings of fact and conclusions of law constitute the decision, which is the final deliberate expression of the court. Expressions of a judge during the trial cannot be considered for the purpose of contradicting deliberate findings of fact and conclusions of law that he subsequently makes and files. (*Strudthoff* v. *Yates,* 28 Cal.2d 602, 615 [5] [170 P.2d 873]; *DeCou* v. *Howell,* 190 Cal. 741, 751 [7] [214 P. 444]; *People* v. *Driggs,* 111 Cal.App. 42, 44 [1] [295 P. 51].)

It thus appears that there was no ground for granting a new trial and that the trial judge's action in denying the motion was correct.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I adopt herewith as my dissenting opinion in the above entitled case the able and learned opinion written by Mr. Justice Ashburn of the District Court of Appeal, Second Appellate District, Division Two, and which is reported in (Cal.App.) 303 P.2d 1084.

For the reasons stated therein, I would reverse the judgment.