[Civ. No. 23324.   Second Dist., Div. Two.   Apr. 1, 1959.]

HOMER HUNTER et al., Plaintiffs and Appellants, v. KEITH B. CROYSDILL et al., Defendants; MARK C. CRAWFORD, Defendant and Appellant.

Stone & Moran, Hugh A. Moran III, Robert W. Anderson and Willard J. Stone for Plaintiffs and Appellants.

Leslie C. Tupper, Leo J. Pircher and Lawler, Felix & Hall for Defendant and Appellant.

FOX, P. J.—Defendant Mark C. Crawford[1] appeals from a judgment entered in plaintiffs' favor in their action to recover money due for credit extended to an ostensible partnership. The plaintiffs appeal on the issue of the extent of the defendant's liability.

## CRAWFORD'S APPEAL

The plaintiffs are partners in the firm of Quinco Tool Products and manufacture, in Detroit, Michigan, a line of cutting tools which are sold to distributors or dealers. For some six years defendant had been the sole owner of M. C. Crawford

---

[1]Keith B. Croysdill and Mary W. Croysdill, also defendants, are not involved in this appeal and reference in the opinion to "defendant" is limited to Mark C. Crawford.

Company, a tool component supply business in Los Angeles, California. One Keith B. Croysdill was employed by the Coast Tool Company, which distributed the plaintiffs' line in the Los Angeles area. Croysdill wished to become the west coast distributor for plaintiffs' products and told Homer Hunter, one of the partners of Quinco, that defendant would be his partner and financial backer. Croysdill also told Hunter that defendant would send him a letter of verification. On June 1, 1955, Crawford sent a letter to Quinco Tool Products, the pertinent portions of which are as follows:

"I have been asked to write and outline to you just how the association of Keith Croysdill and M. C. Crawford would work to your advantage in California, Arizona, and Nevada.
". . . . . . . . . . . . .

"Both Mr. Croysdill and myself have many years background in tooling, and not only in selling but in the use of the tools themselves. Mr. Croysdill is not only thoroughly familiar with the jobbing trade but the present users of Quinco products and in almost all cases can take them with him. I might add that Mr. Croysdill has a fine reputation for his ability and integrity. The M. C. Crawford Co. has been in business for a number of years selling tooling specialties and on every line handled has the exclusive selling rights in California and the states mentioned in the first paragraph. The jobbing distributorship will be set up with a separate identity but with the backing of the financial and other resources of M. C. Crawford Co. Mr. Croysdill will be in charge of promotion and sales.. Business and financial guidance will be in my hands. The necessary mechanics of the invoicing, accounting, shipping and receiving, are already functioning, and all matters will be handled in a businesslike manner.

"I am sure we can do an excellent job for you out here as we have the necessary experience and knowhow to do the job properly. In fact we can promise an almost immediate increase in your present volume.

"We are ready to start functioning as soon as you can furnish the necessary stock, so any change of distributors can be done without any lost time or sales.

"We can and will furnish you with a complete detailed report on all our financial and business connections so that you can satisfy yourselves as to our business and financial integrity.

"I would appreciate knowing your thinking on the matter discussed also any questions you might want answered. It is sincerely hoped that the above will be considered by you and lead to our mutual profit."

Subsequently, on June 20, 1955, defendant and Croysdill flew to Detroit for five days and met with the plaintiffs there for a portion of each of the five days. Hunter testified that "Mr. Crawford said that he would finance this representation of the West Coast and be the financial backer with the financial and other resources of the M. C. Crawford Company, both when he was with Charles Warren [a Quinco partner], Keith Croysdill and myself and himself and to me personally when Mr. Warren was speaking with Mr. Crawford." Hunter further testified that "Mr. Crawford stated that he would be the financial backer and Mr. Croysdill would be the sales manager and take care of ordering" and "we were informed to ship the tools to Associated Tool Supply at the Slauson address of the M. C. Crawford Company." When asked by whom this instruction was given, Hunter answered "Mr. Crawford and Mr. Croysdill." The court asked Hunter whether either Crawford or Croysdill made any statement as to what Associated Tool Company was, and Hunter answered as follows: "Yes, sir. That was to be the company name that both of them had picked out previously to coming to Detroit, to be their company name to represent the Quinco Tool Products." Hunter, when asked by both the court and defendant's counsel as to who made the above statement, replied that it was "both Mr. Crawford and Mr. Croysdill." With reference to a "stocking" order given by Croysdill, Hunter testified that "Mr. Crawford stated that Mr. Croysdill would be in charge of ordering and he gave Mr.—— he told—— or Mr. Crawford told Mr. Croysdill to sit down with Quinco and decide on the original stocking order. . . ."

Subsequently, on June 30, 1955, Croysdill wrote two letters to plaintiffs. The first was on his own stationery and stated that Associated Tool Supply would be on Slauson Avenue, temporarily; that principals would be defendant and himself; that financing and accounting was to be by defendant and sales and inventory by himself. The second letter was on defendant's stationery and asked for verification of ". . . an appointment as agents for Quinco Tool in California and Arizona." These two letters were introduced into evidence, over the objections by the defendant, as plaintiffs' Exhibits 5 and 6.

Hunter testified as follows as to his investigation during June, 1955, into defendant's financial status:

"A. Mr. Crawford stated, while in Detroit, to me, that he would use the assets or the financial and other resources of M. C. Crawford Company to make payment on these tools.

"Q. Did your conversation go to the question of what the resources of the M. C. Crawford Company were? A. Only through people that knew him that I asked, not on paper work.

"Q. Who were some of the people you asked? A. I can't recall the name in Detroit at the minute. He was selling [to] Mr. Crawford.

"Q. What did you learn from that investigation? A. That he paid his invoice to this account.

"Q. Besides inquiries as to that account, did you make any other inquiries as to his financial condition? A. With people I knew in Los Angeles, through former years association selling tools.

"Q. What did you learn through investigation from these Los Angeles sources? A. I was just only informed that he could pay all his obligations. I did not have a dollar set amount high to go on."

On July 8, 1955, Croysdill filed a certificate of fictitious firm name with the county clerk of Los Angeles showing him to be the sole proprietor of Associated Tool Supply. This certificate was published on July 15, 22, 29, and on August 5, 1955.

The trial court found that defendant, beginning on or about June 1, 1955, until January 18, 1956, represented himself to plaintiffs as a partner with Croysdill in Associated Tool Supply; that said representation was made for the purpose and with the intent that plaintiffs would rely thereon and to induce plaintiffs, in reliance thereon, to give credit to such apparent partnership; that plaintiffs did in fact rely on these representations and on the faith thereof extended credit, commencing on July 9, 1955, until January 18, 1956, to such apparent partnership. The trial court also found that, as of January 18, 1956, the date plaintiffs became chargeable with notice that defendant was not in fact a partner in Associated Tool Supply, defendant and Croysdill were indebted to the plaintiffs in the net amount of $14,701.20 for cutting tools sold and delivered by plaintiffs between June 1, 1955, and January 18, 1956, to the apparent partnership existing between defendant and Croysdill.

Defendant attacks the judgment on the following grounds: (1) The finding that defendant represented himself to be a partner with Croysdill is not supported by any evidence; (2) the evidence does not show any reliance by plaintiffs on any representation by defendant that he was a partner with Croysdill; (3) error to admit plaintiffs' Exhibits 5 and 6 and testimony as to a telephone conversation between Hunter and Croysdill; and (4) the filing by Croysdill of the certificate of doing business under the fictitious name prior to the time plaintiffs' books show actual credit given put plaintiffs on notice that they could not thereafter place reliance on asserted representations made by defendant.

Section 15016, subdivision (1) of the Corporation Code, provides in part as follows: ''When a person, by words spoken or written or by conduct, represents himself . . . as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the . . . apparent partnership. . . .''

As previously noted, the trial court found that defendant's conduct placed him within the operation of section 15016, subdivision (1), and defendant attacks the sufficiency of the evidence to support such a finding. It is well settled that ''when a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. (Citation.)'' (*Grainger* v. *Antoyan*, 48 Cal.2d 805, 807 [313 P.2d 848]; *Martin School of Aviation* v. *Bank of America*, 48 Cal.2d 689, 692 [312 P.2d 251].)

First, with reference to the letter of June 1, 1955, which defendant sent to plaintiffs, and his personal conferences with them while he was in Detroit, defendant argues that his declarations were never that he was or would become a *partner* with Croysdill, but that the form of business organization which was to be established between Croysdill and himself was indefinite and, therefore, such declarations were insufficient to give rise to an ostensible partnership.

A partnership is merely ''. . . an association of two or more persons to carry on as co-owners a business for profit.'' (Corp. Code, § 15006, subd. (1).) The evidence fully warrants the

trial court's determination that this was the type of business relationship to which defendant's representations referred. His letter of June 1, 1955, referred to "the association of Keith Croysdill and M. C. Crawford." Also, the respective parts to be played by Croysdill and defendant in the business were outlined, i.e., "Mr. Croysdill will be in charge of promotion and sales. Business and financial guidance will be in my hands." When in Detroit, defendant substantially repeated his prior written representations. While it is true he did not use the word "partnership," the general business form suggested by what he did say certainly falls within section 15006, subdivision (1), *supra*. There was an association of two persons to carry on a business presumably for profit. As to the issue of coownership, defendant spoke of a division of responsibility between himself and Croysdill which did not indicate that he was merely financing Croysdill or acting as a guarantor, for he was to take an active part in the business. Moreover, nothing was said or written which indicated a corporate structure was contemplated.

Defendant next argues that any representations made referred to a future rather than to a past or present business organization, and that an estoppel cannot be invoked where the representations relate to future intentions. It is unquestionably true that the performance of Associated Tool Supply was to be in the future for it would have no obligation to plaintiffs until it was awarded the distributorship. However, the crucial point is whether defendant represented that there was a then existing partnership between Croysdill and himself. Defendant's letter of June 1, 1955, states: "We are ready to start functioning as soon as you can furnish the necessary stock, so any change of distributors can be done without any lost time or sales." When in Detroit, defendant and Croysdill had already selected a name for their business, had decided where the tools were to be shipped, and defendant told Croysdill, while in Detroit, to decide on the original stocking order. Such circumstances strongly suggest that, prior to the time credit was actually extended to Associated Tool Supply, defendant had conveyed the idea that his relationship with Croysdill had matured and was not merely a representation to associate in the future. While we recognize that portions of the June 1 letter are not as clear in this regard as they could have been, we are of the opinion that there was substantial evidence justifying the inference that defendant represented he was currently a partner with

Croysdill, and "[w]hen two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Grainger* v. *Antoyan, supra.*)  The above amply demonstrates the substantiality of the evidence in support of the trial court's finding that the defendant represented himself as Croysdill's partner.

Attention will now be focused on defendant's contention that there was no substantial evidence showing that plaintiffs, in extending credit to Associated Tool Supply, relied on the fact that defendant was ostensibly a partner thereof. In this regard, there was testimony by Hunter that Croysdill was informed that it would take considerable capital to act as plaintiffs' west coast representative, to which Croysdill replied that he only had a small amount of money but could obtain financial backing through partners or interested parties.  Hunter told Croysdill to have these parties or partners write and inform him (Hunter) of their willingness and financial status.  Defendant's letter of June 1, 1955, was a result of this conversation.  Defendant's letter plus the statements made by him in Detroit that he would be the financial backer, taken in conjunction with Hunter's testimony to the effect that Croysdill's financial status was insufficient to warrant a distributorship, reasonably justifies an inference that plaintiffs extended credit because they believed defendant was a partner.

Defendant takes the position that as plaintiffs did not make exhaustive inquiries into his financial status, they could not have relied thereon.  There is no requirement that credit be given in reliance upon the financial status of the apparent partner, but only that the party claiming the benefit of section 15016, subdivision (1), relied on the *existence* of the partnership.  Even assuming, *arguendo*, that plaintiffs had to show they relied not only upon the fact that defendant was a partner, but also upon the fact he was a "safe risk," the evidence shows that they made inquiries—both in Detroit and Los Angeles—regarding defendant's ability to meet his obligations. The trial court impliedly found this investigation evidenced a sufficient showing of reliance and the evidence clearly supports such a finding.

We now turn to defendant's contentions that the trial court erred in allowing in evidence testimony by Hunter that Croysdill, in a telephone conversation, said defendant would

be his partner, and plaintiffs' Exhibits 5 and 6 (letters of June 30, 1955) to which reference has been made in the statement of facts.

It is clear that the unauthorized declarations of Croysdill that he and defendant were partners could not bind defendant, for he is only responsible as an ostensible partner when he represents himself as a partner. (Corp. Code, § 15016, subdivision (1).) Defendant concedes, however, that if prima facie proof of a partnership is shown, then evidence of an extrajudicial statement of one partner that other persons were his partners is admissible. ▉ Declarations of an alleged partner that another is his partner are corroborative of the other's representations and therefore admissible on the issue of reliance once the fact of the other's representations has been independently established. (*Cf. Vanderhurst, Sanborn & Co.* v. *De Witt,* 95 Cal. 57, 62-63 [30 P. 94, 20 L.R.A. 595] ; *Milstein* v. *Sartain,* 56 Cal.App.2d 924, 932 [133 P.2d 836].)

▉ In the instant case, there was a sufficient independent showing of representations made by defendant himself to warrant the admissibility of the questioned evidence on the issue of reliance.

▉ Defendant's final argument is that plaintiffs were put on notice that Croysdill was the sole owner of Associated Tool Supply by virtue of his having filed on July 8, 1955, a certificate of fictitious firm name pursuant to Civil Code, section 2466, showing him to be the sole proprietor thereof. We are of the view, however, that the filing and publishing of this certificate in Los Angeles did not negate the effect of defendant's prior representations or in any manner put plaintiffs on notice that defendant was not a partner in Associated Tool Supply as far as his liability is concerned. ▉ Section 2466 was designed to give public notice of the true names of individuals doing business under a fictitious name or names of all members of a partnership where the firm name does not disclose the names of all the partners, but it was not designed to protect a person who has made prior representations as to his relationship with one who subsequently files and publishes a certificate apparently at variance with those prior representations.

In view of the foregoing, we believe Crawford's appeal is without merit.

## Plaintiffs' Appeal

The trial court found that on January 18, 1956, the date plaintiffs became chargeable with knowledge that defendant

was not a partner, he was indebted to plaintiffs in the amount of $14,701.20. Against this sum, however, the court allowed defendant a $7,877.04 credit, making the amount of the judgment against him, exclusive of interest, $6,824.16. The court apparently arrived at this figure in the following manner: (1) $7,522.87 (Associated Tool Supply inventory of tools as of January 18, 1956, purchased from plaintiffs) plus (2) $354.17 (credit allocated by plaintiffs to the pre-January 18 indebtedness) which equals $7,877.04. Although Croysdill had this $7,522.87 inventory on hand in January, when it was relinquished to plaintiffs on June 1, 1956, it only amounted to $5,285.61. Also, Croysdill increased his net indebtedness by $309.49 after January 18 by additional purchases.

It is plaintiffs' position that as the inventory was not returned in January but in June, defendant should only be credited with $5,285.61, and not $7,877.04. Furthermore, argue plaintiffs, the sum of $309.49 should be subtracted from the amount of the June inventory and applied against Croysdill's increased indebtedness alone. Plaintiffs are willing to give defendant an additional credit of $1,125 (amount applied against Croysdill's indebtedness for reasonable value of his services rendered to plaintiffs from June 1 to August 15, 1956). Therefore, the plaintiffs contend their judgment against defendant should have been in the principal amount of $8,245.91,[2] rather than $6,824.16.

The crux of plaintiffs' argument is that as title to the goods in question passed to Croysdill upon delivery (Civ. Code, § 1739, rule 4(2)), the only credit in this respect available to either Croysdill or defendant depended upon the value of the property actually returned to and accepted by plaintiffs and not on the value of the inventory on January 18, 1956, for no goods were returned to plaintiffs before June 1, 1956.

In opposition to plaintiffs' contentions, defendant justifies fixing January 18 as the proper date to calculate the value of the inventory for credit purposes upon three grounds, namely: (1) plaintiffs' own negligence in not acting sooner was the proximate cause of the inventory dissipation; (2) plaintiffs are estopped to hold him responsible for the dissipation in the inventory by their failure to inform defendant

[2]This figure is arrived at by subtracting the following credits from $14,701.20: (1) $354.17 (conceded by plaintiffs), (2) $1125 (conceded by plaintiffs), and (3) $4,976.12 (June 1 inventory less Croysdill's post-January 18 increase in indebtedness in the amount of $309.49).

they intended to hold him liable after they learned he was not a partner; and (3) laches.

In response to this argument, plaintiffs draw attention to the fact that defendant's answer contained only a general denial and the above three defenses are suggested on appeal for the first time, that no evidence was tendered on these issues nor any findings made thereon. Plaintiffs assert that these are special defenses which are waived if not specifically pleaded, and further question these defenses on their merits.

Defendant may not rely on laches or estoppel. These were not placed in issue by his answer, which contained only a general denial; they were not suggested by a reading of the complaint; nor were these defenses litigated. (*Balestrieri* v. *Sullivan*, 142 Cal.App.2d 332, 343 [298 P.2d 688]; *Medeiros* v. *Cotta*, 134 Cal.App.2d 452, 457 [286 P.2d 546]; see also *Pacific Finance Corp.* v. *Foust*, 44 Cal.2d 853, 858 [285 P.2d 632].)

However, his contention that plaintiffs' own conduct was the responsible cause for the inventory dissipation calls for a consideration of the "avoidable consequences" doctrine.

Generally, "[a] person injured by the wrongful act of another is bound . . . to exercise reasonable care and diligence to avoid loss or minimize the resulting damages and cannot recover for losses which might have been prevented by reasonable efforts and expenditures on his part." (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840, 844 [147 P.2d 558].) The burden of proving facts in mitigation of damages rests upon the defendant. (*Vitagraph, Inc.* v. *Liberty Theatres Co.*, 197 Cal. 694, 699 [242 P. 709]; *Gray* v. *American Surety Co.*, 129 Cal.App.2d 471, 476 [277 P.2d 436].) We are of the opinion that defendant has not sustained this burden. "Moreover, inasmuch as . . . [defendant] pleaded no facts in mitigation of damages . . . [he is] in no position to rely upon this affirmative defense. (Citations.)" (*Danelian* v. *McLoney*, 124 Cal.App.2d 435, 443 [268 P.2d 775].)

On the record before us, there is no sufficient basis for allowing as a credit to defendant the value of the inventory as of January 18. Against the $14,701.20 obligation due on January 18, defendant is entitled to the following credits: (1) $354.17 (Civ. Code, § 1479 (Two) conceded by plaintiffs); (2) $1,125 (conceded by plaintiffs); and (3) $5,285.61 (June inventory), for a total of $6,764.78. Therefore, his liability exclusive of interest, after deducting the above credits, is

$7,936.42. The inventory returned on June 1 is to be applied in full against defendant's indebtedness and, contrary to plaintiffs' contention, is not to be applied, first, to the indebtedness of $309.49 incurred by Croysdill subsequent to January 18. (Civ. Code, § 1479 (Three [3]).)

The principal sum awarded plaintiffs having been altered, interest will necessarily have to be recalculated. Since defendant's liability was fixed as of January 18, 1956 ($14,701.20), interest commences as of that date and continues until the entry of the judgment herein directed, credit of course being given to defendant as follows: (1) January 18, 1956, $354.17 (amount allotted to pre-January 18 indebtedness); (2) June 1, 1956, $5,285.61 (returned inventory); (3) July 1, 1956, $450 (salary credited to Croysdill); (4) August 1, 1956, $450 (salary credited to Croysdill); and (5) August 15, 1956, $225 (salary credited to Croysdill).

That portion of the judgment from which defendant appeals is affirmed. That portion from which plaintiffs appeal is reversed with directions to make new findings of fact and conclusions of law and to enter a new judgment thereon not inconsistent with the views herein expressed.

Ashburn, J., and Herndon, J., concurred.