1998-NMCA-120

964 P.2d 183

**CHEESECAKE FACTORY, INC. d/b/a Dee's Foodservice, a New Mexico corporation, Plaintiff–Appellee,**

v.

**John R. BAINES, Defendant–Appellant.**

**No. 18122.**

Court of Appeals of New Mexico.

July 22, 1998.

Dennis E. Jontz, Nickay B. Manning, Eastham, Johnson, Monnheimer & Jontz, P.C., Albuquerque, for Plaintiff–Appellee.

William A. L'Esperance, Albuquerque, for Defendant–Appellant.

*OPINION*

HARTZ, Chief Judge.

{1} John R. Baines appeals a judgment entered against him in favor of Cheesecake Factory, Inc. The claim against Baines arose out of deliveries of goods to Triples American Grill, an Albuquerque sports bar and restaurant owned by Triple Threat, Inc. Cheesecake Factory contended that it did not know that the business was owned by a corporation and that it extended credit because it believed that the business was owned by a partnership that included Baines as a member. Applying the New Mexico statute on partnership by estoppel, the district court entered judgment against Baines. Baines paid the judgment and appealed. We affirm.

## I. WAIVER OF RIGHT TO APPEAL

{2} First, we address a procedural issue. Cheesecake Factory contends that Baines waived his right to appeal by paying the judgment, because such payment constituted acquiescence in the judgment. As movant on the issue, Cheesecake Factory has the burden of proving waiver. *See In re T.B.*, 121 N.M. 465, 467, 913 P.2d 272, 274 (Ct.App.1996). It relies on a footnote in *Richardson v. Rutherford*, 109 N.M. 495, 787 P.2d 414 (1990), which states as follows:

[W]e note that in some instances, but by no means in all instances, satisfaction of the judgment by an appellant may operate to cut off that party's right of appeal. The majority rule appears to be that voluntary satisfaction of judgment renders an appeal moot.... In *Culp v. Sandoval*, 22 N.M. 71, 159 P. 956 (1916), this Court held that satisfaction of a judgment subsequent to posting of a supersedeas bond by appellant showed that appellant had acquiesced in the judgment and thus precluded the appeal. We concluded that since the filing of the supersedeas bond effectively removed the possibility of any legal compulsion on the appellant to satisfy the judgment pending appeal, the appellant's subsequent satisfaction of the judgment was voluntary. *Culp*, 22 N.M. at 83, 159 P. at 960–61. We reaffirm our holding in *Culp* that certain circumstances exist in which an appellant's satisfaction of the judgment demonstrates

an acquiescence in that judgment that is inconsistent with the right of appeal. Additionally, equities may intervene after satisfaction of the judgment, militating against the maintenance of an appeal. However, absent proper presentation of this issue by the parties, we decline to address this point further.

*Id.* at 498 n. 2, 787 P.2d at 417 n. 2.

**■** {3} We reject the contention of Cheesecake Factory. *Culp* is distinguishable because Baines did not file a supersedeas bond. As pointed out in the *Richardson* footnote, the court in *Culp* found a voluntary acquiescence in the judgment—and thus a waiver of the right to appeal—because the appellant paid the full amount of the judgment even though its supersedeas bond precluded the appellee from executing on the judgment. The language of *Culp* makes clear that absent the bond, the appellant's payment would not have been considered voluntary, so there would have been no waiver of the right to appeal. Our Supreme Court wrote:

We believe, from an examination of the authorities, that the correct determination of the question depends upon whether the payment of the judgment is under legal compulsion; that is, assuming that payment is made prior to the issuance of execution, that such payment is regarded as having been compulsory by reason of the right existing in the judgment creditor to have issued execution and to have enforced payment at the time payment is made. . . .

The reason for the majority rule which recognizes the right of appeal, even though the judgment be paid without execution, is that, the judgment debtor having the power to coerce payment, the payment by the judgment creditor without execution is not a voluntary acquiescence in, or recognition of, the judgment.

*Culp*, 22 N.M. at 83, 159 P. at 960. Although this language could be characterized as dictum, we are content to follow it. Involuntary payment of a judgment does not foreclose the payor's right to appeal, and payment to avoid execution on a judgment is involuntary.

We add only a few words regarding involuntariness and the policy behind the *Culp* rule.

**■** {4} No New Mexico statute or court rule requires a judgment debtor to file a supersedeas bond as a condition to appealing the judgment. *Cf.* Rule 1–062 NMRA 1998 (stay of proceedings to enforce a judgment). When there is no such bond, however, the judgment creditor can proceed to execute on the judgment. Thus, the judgment debtor/appellant faces three options: filing a supersedeas bond, risking execution on the judgment, or paying the judgment. The most attractive one may be payment of the judgment. Such payment eliminates (a) the cost of a bond, (b) the possibility of paying interest on the judgment at a rate above that at which the appellant could borrow money to pay the judgment, and (c) a judgment lien on the appellant's property. But the fact that payment of the judgment may be the option most attractive to the appellant does not make that option a voluntary one. All three options result from the compulsion of the judgment entered against the appellant. Thus, in our view, payment of the judgment debt when no supersedeas bond has been filed is ordinarily an *involuntary* payment. (We note, however, that a payment may be voluntary if it is the result of a settlement agreement between the parties. *See Franzen v. Dubinok*, 290 Md. 65, 427 A.2d 1002, 1005–06 (1981).)

{5} This result would seem to us to be sound public policy. We should refrain from embracing a rule that would discourage payment of a judgment debt pending appeal. For one thing, such payment would eliminate economic pressure that could force an appellee to compromise a strong case on appeal.

**■** {6} Nor do we perceive any purpose to be served by denying the right to appeal. Contrast the situation in which the judgment debtor has paid the judgment voluntarily. One reason to deny such a judgment debtor the right to appeal is that the appeal would serve no purpose. Even if the judgment debtor prevailed on appeal, the court could not compel the judgment creditor to return the payment. This follows from the general rule that one who makes a voluntary payment to another has no right to

restitution. *See* Restatement of Restitution § 112 (1937). Thus, if a judgment debtor voluntarily paid the judgment, appealed the judgment, and obtained a reversal, it would have no cause of action in restitution to reclaim the money paid to the judgment creditor, and the appeal would accomplish nothing except wasting time and money. *See Franzen*, 427 A.2d at 1006, 1007–08; *cf. Turner v. Mountain Eng'g and Constr., Inc.*, 276 Mont. 55, 915 P.2d 799, 802–05 (1996) (discussing waiver of right to appeal and mootness arising from unavailability of a remedy despite a successful appeal). When the payment of the judgment debt is *involuntary*, however, a judgment debtor who prevails on appeal has a right to restitution of any excess amount paid. *See Culp*, 22 N.M. at 83, 159 P. at 960; *Franzen*, 427 A.2d at 1006; Restatement of Restitution § 74. To be sure, as a practical matter the judgment debtor may have difficulty collecting from the appellee; but we see no reason to deprive it of the right to appeal simply because it decides to pay the judgment and take that risk. *Cf. Courtney v. Nathanson*, 112 N.M. 524, 525, 817 P.2d 258, 259 (Ct.App.1991) (judgment creditor who accepts payment on judgment waives right to appeal unless appeal could not result in creditor's receiving less).

{7} Cheesecake Factory points to one respect in which it may be prejudiced by Baines' payment of the judgment. If Baines had filed a supersedeas bond, the bond ordinarily would cover his potential liability for costs on appeal. *See* Rule 1–062(D). But Baines, having paid the judgment entered in district court, has provided no security for payment of appellate costs. Cheesecake Factory may be entitled to its attorney fees on appeal, so costs could be substantial. Nevertheless, Cheesecake Factory is no worse off than it would have been had Baines paid nothing. It could hardly execute on the district court judgment to obtain reimbursement for appellate costs not yet vested or accrued. The risk to Cheesecake Factory would have been obviated if it could have obtained a court order requiring Baines to file security for costs on appeal. But Cheesecake Factory did not move for an order requiring security for costs, so we need not consider whether the district court would have the authority to enter such an order.

{8} In short, we hold that Cheesecake Factory has not established that Baines voluntarily paid the judgment against him. Accordingly, Baines could properly pursue this appeal.

## II. PARTNERSHIP BY ESTOPPEL

{9} Triples American Grill was owned by a corporation, Triple Threat, Inc. Cheesecake Factory, however, contended that it did not know that the entity to which it was advancing credit was a corporation. It claimed that representations by Frank Kolk, the manager of the business, caused it to believe that the sports bar was owned by a partnership. Its theory of liability in the district court was that Baines was a partner by estoppel and therefore liable for the debt incurred by the sports bar. The district court agreed. We affirm because the evidence at trial, viewed in the light most favorable to the judgment, could persuade a rational trier of fact that Baines was a partner by estoppel. *See Clovis Nat'l Bank v. Harmon*, 102 N.M. 166, 168–69, 692 P.2d 1315, 1317–18 (1984).

{10} The New Mexico Uniform Partnership Act contains the following provision:

**Partner by estoppel.**

A. When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him or anyone, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making representation or consenting to its being made.

(1) When a partnership liability results, he is liable as though he were an actual member of the partnership.

(2) When no partnership liability results, he is liable jointly with the other persons, if any, so consenting to the contract or representation as to incur liability, otherwise separately.

B. When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation. Where all the members of the existing partnership consent to the representation, a partnership act or obligation results; but in all other cases it is the joint act or obligation of the person acting and the persons consenting to the representation.

NMSA 1978, Section 54–1–16 (1947) (repealed 1997). The language is essentially identical to Section 16 of the Uniform Partnership Act (1914). (We should note that the Uniform Partnership Act was superseded in New Mexico after the trial in this case. The Uniform Partnership Act (1994), which is codified at NMSA 1978, §§ 54–1A–101 to –1005 (1996), became effective July 1, 1997.)

{11} Under this section even though an enterprise is a corporation, a person can be treated as a partner, and consequently exposed to personal liability for the corporation's debts, when representations are made that the enterprise is a partnership and the person is a partner. The representations must be made by the purported partner or with the purported partner's consent. The section distinguishes between representations made in a "public manner" and other representations (which we will refer to as "private" representations). "If the representation is privately made, it may be taken advantage of only by persons to whom it was made; if it was publicly made, anyone (roughly speaking) can make use of it." Alan R. Bromberg, *Crane and Bromberg on Partnership* 197 (1968) (footnotes omitted).

{12} One issue on appeal is whether Cheesecake Factory can recover regardless of whether it relied on representations of Baines' partnership status. When a representation is private, the statute explicitly requires the claimant to establish that it "has on the faith of such representation, given credit to the actual partnership." Section 54–1–16(A). Cheesecake Factory argues that no such reliance is necessary if the representations are made "in a public manner." *Id.* Accordingly, it asserts that it need prove only that Baines made or consented to public representations of his partnership status. As an alternative basis for affirmance, Cheesecake Factory argues that it in fact relied on private representations of Baines' partnership status.

{13} We begin by discussing whether the statute requires reliance on representations made in a public manner. We determine that the prudent course on this appeal is to assume that reliance is required. We then proceed to review whether the evidence will support findings that (1) Baines consented to representations to Cheesecake Factory of his partnership status and (2) Cheesecake Factory relied on such representations.

## A. Representations Made in a Public Manner

■ {14} Cheesecake Factory contends that if Baines' partnership interest was represented "in a public manner," Baines is liable to Cheesecake Factory regardless of whether it relied on such representations. We are not persuaded.

{15} At the outset of our discussion, we must acknowledge that strong support for Cheesecake Factory's contention can be found in our Supreme Court's decision in *Gilbert v. Howard*, 64 N.M. 200, 326 P.2d 1085 (1958). The Court paraphrased the statutory provision as follows:

The statutory test for partnership by estoppel requires that (1) credit must have been extended on the basis of partnership representations or (2) that the alleged partner must have made or consented to representations being made in a public manner whether or not such representations were actually communicated to the person extending credit.

*Id.* at 202, 326 P.2d at 1086. The Court found that the first test had not been met in that case:

> Since plaintiffs did not even know Moore existed at the time of the leasing there could have been no reliance upon his credit and defendant Moore is not liable under the first part of [Section 54–1–16], which is the same as the common-law test for liability in New Mexico before the adoption of the Uniform Partnership Act in 1947.

*Id.* at 202–203, 326 P.2d at 1086. The opinion then contains the passage chiefly relied upon by Cheesecake Factory:

> However, the last part of [Section 54–1–16] reads as follows:
>
> '. . . and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making representation or consenting to its being made.'
>
> This section extends liability beyond the common-law test of reliance so that when one has by his acts or his consent to the acts of others allowed or caused the general community to believe that he is a partner then he is such by estoppel even though this particular creditor may not have heard the representation. This relieves the creditor of the task of proving that he actually knew of such representation and makes the representation itself an offense without the added factor of reliance.

*Id.* at 203, 326 P.2d at 1087 (ellipses in original). In that appeal, however, the Court ruled that the representations had not been made in a "public manner," so the defendant was not liable under the statute. *Id.* at 203–04, 326 P.2d. at 1087–88.

{16} *Gilbert* was followed a dozen years later. In *Anderson Hay & Grain Co. v. Dunn,* 81 N.M. 339, 467 P.2d 5 (1970) our Supreme Court repeated *Gilbert*'s paraphrase of the statutory test for partnership by estoppel, *id.* at 341, 467 P.2d at 7, although it ruled that there was reliance in that case.

{17} Despite this weighty authority, we are reluctant to adopt the proposition that reliance need not be shown when representations of partnership are made publicly. If the issue were squarely put to our Supreme Court, we believe that it would always require reliance to establish a partner by estoppel under Section 54–1–16. The following considerations lead us to this conclusion.

{18} First, as partially acknowledged in *Gilbert,* recognizing estoppel without reliance would be a sharp departure from firmly grounded common-law principles. The foundation of estoppel is that one is bound by saying or doing something upon which another relies to his or her detriment. *See, e.g., Continental Potash, Inc. v. Freeport–McMoran, Inc.,* 115 N.M. 690, 697–98, 858 P.2d 66, 73–74 (1993). Why should that principle not be followed in this context? Why should a person who did not rely on the existence of the partnership be permitted to claim an estoppel?

{19} Of course, statutes often change the common law, and judges would be abusing their power if they insisted on following the common law despite contrary statutory enactments. The point here is only that a court is well-advised to take a second look at statutory language if an initial reading suggests a meaning that constitutes a sharp break with long-standing principles for no apparent reason.

{20} A second took at the language of Section 54–1–16 suggests that the portion of Subsection A relating to public representations does not remove the requirement of reliance. Consider the language of Subsection B:

> When a person has been *thus* represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, *with respect to persons who rely upon the representation.*

(Emphasis added). The word "thus" is a reference back to Subsection A. Accordingly, under Subsection B even when the represen-

tation has been made "in a public manner," the purported partners are bound only "to persons who rely upon the representation." It would be remarkable to require reliance under Subsection B but not under Subsection A.

{21} Most important of all, the best reading of Subsection A is that the fact of public representation does not eliminate the requirement of reliance. The language regarding public representations states: "if he has made such representation or consented to its being made in a public manner he is liable to *such* person...." (Emphasis added). Who is "such person"? The obvious candidate is the person described earlier in the sentence: a person "to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership." In other words, "such person" is one who has relied on the representation. The purported partner is liable only to one who has relied.

{22} What, then, is the purpose of the language relating to public representations? What follows from a public representation that does not result from a private one? Only that one can be a partner by estoppel, and therefore liable to one who has relied on a representation, even though the partner by estoppel did not know of or consent to the representation being made to the person who relied. Ordinarily, a purported partner cannot be held liable as a partner by estoppel to someone to whom the representation was made unless the purported partner made the representation to the person who relied or consented to the representation being made to that person. But if the representation of partnership is made "in a public manner," the person claiming partnership by estoppel need not prove that the purported partner authorized the representation to that particular person. Not only is this a reasonable reading of the statutory language, it makes sense as a proposition of law. One who consents to a public announcement that he or she is a partner can expect unknown others to hear and rely on the announcement; and holding the purported partner to the consequences is a fair result under familiar equitable concepts.

{23} Outside of New Mexico case law, the authorities support this interpretation. Referring to the language regarding public representations, Professor Painter wrote:

> This awkward clause is apparently little more than an attempt to codify what may have been the law in America and what in England was the law by statute; namely that, if there is a hold out "in a public manner" either by the defendant or by another with the defendant's consent, then the defendant need not consent specifically to the particular form of holding out upon which the plaintiff has relied. Why this relatively simple concept required such complex terminology is an enigma.

William H. Painter, *Partnership by Estoppel,* 16 Vand.L.Rev. 327, 338 (1963) (hereinafter Painter). Likewise, *1 Bromberg and Ribstein on Partnership* at 2:161–162 (1998 Supp.) states:

> It has been held that the portion of [Section 16 of the Uniform Partnership Act] dealing with representations "made in a public manner" removes the reliance requirement with respect to public representations. But this provision appears to relate only to the purported partner's consent to the representation to a particular plaintiff ... rather than to the reliance requirement, so that a public representation would not create an estoppel as to one who does not become aware of it.

(Footnotes omitted). We note that Section 308 of the Revised Uniform Partnership Act (adopted in New Mexico effective July 1, 1997, under the title "Uniform Partnership Act (1994)," Section 54–1A–1202) uses much clearer language:

> If the representation, either by the purported partner or by a person with the purported partner's consent, is made in a public manner, the purported partner is liable to a person who relies upon the purported partnership even if the purported partner is not aware of being held out as a partner to the claimant.

Section 54–1A–308(a) (1997). As explained by one commentator:

> [The Revised Uniform Partnership Act] has resolved any doubts that may exist

about the necessity of a creditor to prove reliance in a public holding out case, a problem that was created by some abstruse language in [Section 16 of the Uniform Partnership Act] that, carelessly read, seemed to obviate the requirement of reliance in a public holding out.

J. Dennis Hynes, *Agency, Partnership, and the LLC—In a Nutshell* at 114 (1997). Thus, we will assume for purposes of this appeal that Cheesecake Factory had to establish reliance.

### B. Consent to Being Represented as a Partner

■ {24} We now turn to the two elements of Cheesecake Factory's cause of action that Baines contends are missing. First, we address whether Baines consented to Kolk's representation to Cheesecake Factory that he and Baines were partners in Triples American Grill. Then we address the question of reliance. We hold that the evidence was sufficient to prove both elements. *See Clovis Nat'l Bank*, 102 N.M. at 168–69, 692 P.2d at 1317–18.

{25} Steve Mager, the president of Cheesecake Factory, testified that before Cheesecake Factory advanced credit to the sports bar, Kolk told him that Kolk and Baines were in a partnership of three persons that owned the bar. Although there was no direct evidence that Baines authorized Kolk to tell Cheesecake Factory that Baines was a partner in the business, there was ample evidence to support an inference that Baines consented to Kolk's making such a representation. Among that evidence was the following: Cheesecake Factory first extended credit to the business on February 10, 1993. On February 23, 1993, an account was opened at Western Bank of Albuquerque in the name of "Baines: Bob DBA Triples American Grill." (Baines was generally known in the community as "Bob" Baines.) The signature card contains two signatures, those of "Bob Baines, owner" and "Frank Kolk, owner." On March 3, 1993, a payroll account was opened at Western Bank in the same name. The signatures on the signature card were "Bob Baines" and "Frank Kolk." Baines was frequently present at the sports bar and freely entered the business office.

As a result, employees believed that Baines was a partner. In addition, there was testimony that Baines himself had told others that "he had a sports bar" and "was a partner" in the business. Although these statements by Baines may have been as much as nine months after Kolk first told Mager that Baines was a partner, they are probative of a consistent pattern of behavior over the course of several months indicating Baines' consent, indeed desire, to be perceived as a partner in the business. Viewing the evidence in the light most favorable to the judgment, *see id.*, we believe that the district court could reasonably infer that Baines consented to Kolk's representing Baines' partnership status to Cheesecake Factory.

### C. Reliance

{26} Finally, we address the claim that Cheesecake Factory did not prove that it relied on the purported partnership. In one respect the evidence of reliance by Cheesecake Factory is clearly supported by the evidence. Mager and his sales manager, Don Grosso, testified that Cheesecake Factory was willing to extend credit to the new business only because it was a partnership. In particular, they testified that credit would not have been extended to a new restaurant organized as a corporation because the restaurant business is risky and it may be impossible to collect a debt from a failed corporation. Mager testified that he had "never gotten burnt" by a partnership and "I'm more likely to go in looking at it from the bright side because there are partners involved and liability runs to the individual partners."

{27} Cheesecake Factory contends that reliance on the existence of a partnership sufficed for creation of a partner by estoppel. It relies on *Hunter v. Croysdill*, 169 Cal. App.2d 307, 337 P.2d 174 (1959). Considering language in the California Corporations Code identical to that in Section 54–1–16(A), *Hunter* said:

> Defendant takes the position that as plaintiffs did not make exhaustive inquiries into his financial status, they could not have relied thereon. There is no require-

ment that credit be given in reliance upon the financial status of the apparent partner, but only that the party claiming the benefit of [the California counterpart to Section 54–1–16] relied on the existence of the partnership.

*Id.* 337 P.2d at 179.

{28} The rule in *Hunter* is an attractive one for Cheesecake Factory, because the evidence of reliance on Baines' credit is slim. Cheesecake Factory sought no financial statement from Baines and made no credit inquiry or, apparently, any inquiry whatsoever about Baines. Mager said simply that he was familiar with the name Baines and associated it with the construction or automobile business. Also, Mager said that he was told by Kolk that the partners owned the extensive sports memorabilia on display, that one of the partners was going to arrange for display of a pace car, and that Baines was helping to remodel the restaurant.

■ {29} Mager's failure to obtain a credit check on Baines limits the extent to which Cheesecake Factory could reasonably rely on Baines to cover debts incurred by the sports bar. But that does not mean that Cheesecake Factory could not reasonably rely at all on the fact that Baines was a partner. As indicated by Mager's testimony, the very fact of a person's being a partner provides some comfort for creditors. One whose personal assets are at risk in a business venture can be expected to take a particular interest in having the enterprise run properly and paying its bills out of business revenue. Moreover, the evidence at trial, although marginal, would support the inference that Mager reasonably believed Baines to be the proprietor of an established business. At least two rational inferences can be drawn from that fact. First, as proprietor of an established business, Baines would have expertise that could be helpful in the financial affairs of the sports bar. Second, even if Mager could not be confident that Baines could pay very large debts, he could expect Baines to be financially responsible. Cheesecake Factory's dealings with the sports bar would not be likely to lead to huge debts. We note that the principal amount owed on open account in this case was slightly more

than $20,000. Although this is not an insignificant amount, even one without great wealth—and probably most owners of established businesses—could be expected to pay off a substantial portion of the sum. Thus, the evidence at trial would support a rational inference that Cheesecake Factory reasonably relied on Baines' being a partner.

{30} One possible reaction to this analysis is that it proves too much. By the above reasoning the trier of fact could almost always find reasonable reliance. That may be true. But that is not necessarily contrary to the rationale of the statute. The nature of the reliance required to establish partnership by estoppel has been little explored by courts or commentators. *See* Painter, *supra,* at 334. As previously noted, California has ruled that the creditor need rely only on the existence of the partnership. *See Hunter,* 337 P.2d at 179. Perhaps this ruling reflects the realization that once the creditor relies on the existence of the partnership, the creditor will be relying to some extent on each of the partners. On that basis we might be inclined to adopt the California rule. In our view, however, faithfulness to the statutory language requires us to leave open the possibility in any particular case that there was no reliance on a particular person's being a member of the partnership. We find the words of Professor Painter to be persuasive. In discussing whether a plaintiff should be required to prove that it would not have extended credit but for the representation of partnership, he wrote as follows:

[W]here the plaintiff has not previously dealt with the firm, it seems unduly burdensome to impose upon him the rigors of a "but-for" test, since this complicates the problems of proof to the point that recovery is unusually difficult. This seems to be a reasonable view; in most instances where the plaintiff is aware of the holding out and, being so aware, extends credit to what he supposes is a partnership, he will be motivated at least in part by an *assumption,* albeit a vague one, that the defendant is financially responsible and that his credit stands back of that of the firm. Hence there should be at least a presumption of reliance on the defendant's

financial responsibility, subject to possible rebuttal by a showing of complete indifference on the part of the plaintiff to the representation.

Painter, *supra*, at 335 (footnotes omitted) (emphasis added). *See* Allen Dewey, *Partnerships—Partnership by Estoppel—Proof of Reliance by Creditor Dealing with Persons in Belief of Partnership*, 56 Mich.L.Rev. 139 (1957).

{31} In sum, the test for reliance is not whether it would have been good business practice to advance credit relying solely on Baines' being a partner. Many factors may go into the decision whether to advance credit. The only question is whether it was reasonable for one of the factors to be that Baines was a partner. Although it may be tempting to rule against a creditor who apparently has not engaged in the wisest business practices, it must be realized that the partner by estoppel is the "victim" only of misrepresentations that he himself authorized. This is a close case, but we hold that the evidence of reliance is sufficient to sustain the judgment. *See Clovis Nat'l Bank*, 102 N.M. at 168–69, 692 P.2d at 1317–18 (standard of review on appeal).

## III. CONCLUSION

{32} For the above reasons, we affirm the judgment below. We award Cheesecake Factory attorney fees of $3,000.00 and its costs on appeal.

{33} **IT IS SO ORDERED.**

APODACA and FLORES, JJ., concur.