**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 6 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AG SERVICES OF AMERICA, INC.,
an Iowa corporation,

      Plaintiff-Appellee,

v.

JOHN D. NIELSEN, also known as
JACK NIELSEN and DIAMOND
HILL FARMS, CLOVIS, INC., a New
Mexico corporation,

      Defendants-Third-Party
      Plaintiffs-Third-Party Counter-
      Defendants-Appellants,

v.

TERRY LUNDELL,

      Third-Party Defendant-
      Third-Party Counter-Claimaint.

No. 99-2081

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV-96-1637-JC/WWD)**

---

Joseph E. Manges (Paula A. Cook, with him on the brief), of Comeau, Maldegen,
Templeman & Indall, LLP, Santa Fe, New Mexico, for Plaintiff-Appellee.

Stephen S. Hamilton, Montgomery & Andrews, P.A., Santa Fe, New Mexico,
(Laurice Margheim, Curtiss, Moravek, Curtiss & Magheim, Alliance, Nebraska, with
him on the briefs) for Defendants-Appellants.

Before **MURPHY** and **HOLLOWAY**, Circuit Judges, and **COOK**, District Judge.*

**HOLLOWAY**, Circuit Judge.

This is a diversity case arising from an agricultural loan. Plaintiff/appellee Ag Services of America, Inc. (Ag Services), the lender, commenced the action in the district court against Defendant/appellant John Nielsen and Diamond Hill Farms, Clovis, Inc. (DHFC). Ag Services asserted under a number of different theories – including conversion, fraud, negligent misrepresentation, unjust enrichment, piercing the corporate veil, and partnership by estoppel – that Nielsen should be held liable for an unpaid agricultural loan it had extended to Terry Lundell. Ag Services sought recovery of some $691,000 in monetary damages, interest, costs, attorney's fees, and punitive damages in its complaint. I App. 38. As for DHFC, Ag Services alleged that it had converted crop proceeds in which Ag Services held a security interest, an interest which had been granted by Lundell as part of the loan agreement.

**I**

**A**

At the bottom of this controversy is the fact that Ag Services made a loan to

_____

*The Honorable H. Dale Cook, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation.

Lundell of almost $800,000 which he failed to repay. Lundell had leased a large farm near Clovis, New Mexico, on which he planned to grow potatoes (on about one-quarter of the farm) and other crops. The terms of the loan agreement contemplated that the crops (for our purposes, especially the potatoes) and the proceeds from those crops would be the primary collateral for the loan. The evidence was that the income from the potatoes was slightly greater than the production costs. Ag Services, however, received only $50,000 of the approximately $2 million of crop proceeds.

Nielsen was associated with Lundell in the potato operation with Ag Services' approval, but he had nothing to do with other crops Lundell was growing on the Clovis farm. Shortly after the bulk of the advances had been made on the loan agreement, Nielsen and Lundell formed DHFC. With few exceptions the eventual potato proceeds went to DHFC and from its account into an account in the name of Lundell Farms, the name under which Lundell was conducting the farming of other crops on the Clovis farm.

Having received only fifty thousand dollars from potato proceeds, Ag Services eventually sued Lundell in state court in Iowa. That suit was settled with no cash payment from Lundell. Ag Services then brought the instant suit against Nielsen. One of Ag Services' primary contentions was that Nielsen knowingly used DHFC to avoid Ag Services' security interest in the potatoes and potato proceeds.

Nielsen's defense was based largely on the contention that the potato proceeds

in the Lundell Farms account were more than sufficient to repay the loan, but Lundell took almost half the proceeds and used them to repay himself for his contributions to the endeavor and for other personal uses. Nielsen received a much smaller portion of the proceeds, approximately fifteen per cent, which reimbursed only about half of his contributions to the enterprise, leaving him with a net loss which he calculated to be $389,075.00. [1] The rest of the proceeds had been paid to other creditors.

At the end of the 1992 season, Lundell acknowledged his receipt of funds in excess of his contributions and gave Nielsen a promissory note in the amount of $355,000.00. Nielsen later brought suit on this note in state court in Arizona and was granted judgment by default, but Nielsen received no payments on this judgment. [2]

**B**

Below, the instant case proceeded to trial in which Ag Services' legal claims (conversion, fraud and negligent misrepresentation) were tried to a jury, with other, equitable claims (piercing the corporate veil, partnership by estoppel and *quantum*

---

[1] Nielsen's evidence as to the final accounting for the 1992 Clovis potato operation was not contested at trial.

[2] Nielsen brought a third-party complaint against Lundell in the instant case, and Lundell filed a counterclaim against Nielsen. The district court's grant of summary judgment to Nielsen on Lundell's counterclaim on *res judicata* grounds is the subject of a related appeal, No. 99-2094, in which our opinion is being filed today.

*meruit* ) being tried simultaneously to the judge by consent of the parties. [3] The jury was thus instructed to decide whether Nielsen was liable to Ag Services under the three legal theories first mentioned – conversion, fraud, and negligent misrepresentation. The jury was instructed that as to conversion, it should determine whether Nielsen and DHFC were liable. The jury found in favor of defendant Nielsen on all three legal theories advanced against him – conversion, fraud and negligent misrepresentation. The jury found DHFC liable to Ag Services for conversion and assessed $162,000 in damages against DHFC. DHFC has not appealed that judgment against it. [4] Nor has Ag Services appealed that award, although it is for less than it sought.

After the lengthy jury trial, the court heard additional argument on the equitable claims against Nielsen and took the matter under advisement. The district judge, during argument to him about the equitable claims, said the jury's findings in favor of Nielsen on the legal claims of conversion, fraud and negligent misrepresentation "were erroneous." [5] The judge later issued his own findings of fact

---

[3]The district judge in effect granted judgment as a matter of law on several of Ag Services' legal theories by declining to instruct the jury on those theories. Ag Services has not appealed those rulings.

[4]While DHFC joined in the notice of appeal with Nielsen, it did not join in the brief, and we deem it to have abandoned its appeal.

[5]During the argument to the court, counsel for Mr. Nielsen said that the court was bound not just by the facts stated in the jury verdict, but also by any facts the
(continued...)

and conclusions of law, holding that Nielsen was liable to Ag Services for damages of $412,352, plus prejudgment interest at the rate of ten per cent per annum. As we read the court's findings and conclusions, the judge held that Nielsen was liable for this sum under the equitable theories of partnership by estoppel, piercing the corporate veil, and *quantum meruit* or unjust enrichment. [1]

---

[5](...continued)
jury must have necessarily found. 5 App. at 1548. Nielsen's counsel further said the jury was instructed that if they found that DHFC had converted potatoes or proceeds, and if they found "that defendant Nielsen directed, controlled or ratified the activity that lead to the conversion, then he is personally liable for damages." *Id.* Counsel pointed out the jury found no personal liability for damages as to Nielsen, and if they followed the instruction, Instruction No. 8-S, I App. 341, which we must assume they did, that meant that the jurors found that he did not direct, control, approve or ratify the activity that constituted a conversion. *Id.* The trial judge interjected:

> In my opinion, there's no way the jury should have found that. I mean, that's clearly, to me, an erroneous jury verdict, so I'm sitting here in equity taking care of it on the other basis, and this is one of the times, one of the few times, when I disagree with the jury. I think they just reached a compromise verdict to get out of here. I mean, after several days of listening to you all, I think they were tired and probably a little bored and just wanted to get away.

*Id*. Thus the judge disregarded the jury's findings, which we agree had been to the effect that Nielsen did not direct, control, approve or ratify the conversion activity.

[1]The parties dispute whether the district court also held that Nielsen was liable as a corporate insider for the receipt of a preferential payment and, if so, whether Nielsen had proper notice that such a theory was asserted. The theory does not appear in the pretrial order and, as we read the district judge's findings and conclusions, he did not rule on this basis.

While there is a finding that all of the assets received by Nielsen were wrongful preferences, that appears to have been made in support of the court's conclusion that the corporate veil should be pierced. There are no other conclusions of law addressing wrongful preference. The court also made a finding as to the
(continued...)

-6-

## II

### A

Nielsen's appeal challenges the court's judgment entered against him which the judge's findings and conclusions said was for $412,352 and prejudgment interest, as noted above. Nielsen says that the judgment against him in effect is for approximately $750,000 when interest is computed, and that the judgment is in error.

First, Nielsen's central argument is that his rights under the Seventh Amendment to the United States Constitution were violated by the judge's findings and conclusions on the equitable claims. He argues that the judge was bound by all jury findings expressly made and those implicit in the jury's verdict on the legal claims. Nielsen says that the jury had earlier completely exonerated him on the legal claims of fraud, negligent misrepresentation and conversion, and that the jury had found that Ag Services' total damages were only $162,000 with interest included. In addition, Nielsen argues there were other errors in the judge's findings that he was liable on the equitable claims presented.

### B

[1](...continued)
statute of limitations defense which specifically mentions three equitable theories of relief, the ones discussed herein, but not wrongful preference. Similarly, the judge made an alternative ruling which also mentioned the three equitable theories of relief, but not wrongful preference. Accordingly, we need not address this issue further.

We first turn to Nielsen's Seventh Amendment argument which we find dispositive. Nielsen argues that in deciding the equitable claims, the district judge erred by rejecting the jury's verdict and making findings of fact which conflict with that verdict.

Nielsen's argument focuses on controlling principles that support his Seventh Amendment argument. Those principles flow logically from the seminal decisions of the Supreme Court protecting Seventh Amendment rights to trial by jury – *Dairy Queen, Inc. v. Wood*, 369 U. S. 469 (1962), and *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959). In applying those teachings we have held:

> The Seventh Amendment protects a party's right to a jury trial by ensuring that factual determinations made by a jury are not thereafter set aside by the court, except as permitted under common law. . . . . *Thus, under the Seventh Amendment, the court may not substitute its judgment of the facts for that of the jury; it may only grant a new trial if it concludes that the jury's verdict was so against the weight of the evidence as to be unsupportable.*
> *The strictures of the Seventh Amendment are particularly applicable in a case where, due to the presence of both equitable and legal issues, trial is both to the jury and to the court. In such a situation, when a case involves both a jury trial and a bench trial, any essential factual issues which are central to both must be first tried to the jury, so that the litigants' Seventh Amendment jury trial rights are not foreclosed on common factual issues. Moreover, the court is bound by the jury's determination of factual issues common to both the legal and equitable claims.*

*Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1442-43 (10th Cir. 1988) (emphasis added; internal citations omitted). *See also Butler v. Pollard*, 800 F.2d 223, 224-26 (10th Cir. 1986).

-8-

In *Butler v. Pollard*, the plaintiffs' legal claim had been tried to a jury, which had rendered a verdict in favor of some of the defendants. The trial judge then decided that he was not bound by the jury verdict and issued an injunction against all of the defendants. This court reversed, holding that the general verdict in favor of the individual defendants undercut any basis for the injunction. The legal claim was one of trespass. By deciding that claim in favor of the individual defendants, our court held, the jury "of necessity" must have determined either that there had been no entry upon the plaintiffs' property or that any entry had been with permission. *Id*. at 225. Significantly for our purposes, the general verdict in that case did not demonstrate which of these factual issues were decided in favor of the individual defendants. This court examined the possible bases for the verdict, however, and determined that either alternative would vitiate any ground for the injunctive relief sought.

Thus, in accord with *Butler v. Pollard*, we must consider what findings are explicit or necessarily implied by the verdict, including examining alternative bases by which the jury could have reached its conclusion. We said in *Butler* that the matter was one of issue preclusion (formerly termed collateral estoppel), and the general rule in applying issue preclusion appears to be in accord with our reading of *Butler*. *See* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4420, at pp. 186-87 (1981).

In defending the trial judge's actions here in rejecting the jury's earlier findings and substituting his own to decide the equitable claims, Ag Services contends that the jury verdict was, as the trial judge said, erroneous and a compromise verdict, reached simply so the tired jurors could go home. The judge did indeed make remarks to this effect at the subsequent hearing on the equitable claims.[7] If the trial judge believed that the verdict was so against the evidence as to be unsupportable, he could have set it aside. *See* Fed. R. Civ. P. 59(a) (court may order new trial *sua sponte*). But here the trial judge did *not* set aside the verdict and order a new trial, notwithstanding his comments disparaging the verdict. The trial judge here instead made his own findings on the equitable claims. He left intact the jury's verdict and its explicit findings and those necessarily implicit from the verdict. We also note that Ag Services did not file any post-trial motion to challenge the verdict, nor is any challenge to the verdict made on appeal. Consequently, we conclude that we must treat the verdict as binding under collateral estoppel or issue preclusion principles. *See Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1272 (10th Cir. 1995).

The district judge, as we have noted, disregarded the jury verdict although he did not set it aside. We conclude that this was error, depriving Nielsen of his right to a jury determination of all issues common to the legal and equitable claims. *See*

---

[7]See note 5, *supra*, quoting the referenced remarks.

*Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 552-53 (1990) (reversing judgment based on trial judge's findings on equitable claims; where properly joined legal claims had been dismissed in error, entire judgment must be vacated and the case retried with legal claims decided by a jury so that litigant's right to jury trial is preserved). We must therefore turn to an analysis of what findings were actually made by the jury or were necessarily implicit in its verdict, *see Butler v. Pollard*, 800 F.2d at 225, and whether the subsequent findings by the trial judge in deciding the equitable claims may have been in conflict with the jury's determinations. If there is no conflict, the error would be harmless.

### III

As we have already pointed out, the analysis in *Butler v. Pollard* did not purport to determine the precise basis of the jury verdict, and we glean from that case the teaching that such precise inferences are not always necessary for application of issue preclusion. Instead, we examine the possible inferences from the verdict against the findings and conclusions made by the district judge on the equitable claims.

Ag Services contends that the general verdict did not necessarily decide any specific issue of fact and so properly was given no preclusive effect by the judge in

deciding the equitable claims. [8] *See* Brief of Appellee Ag Services of America, Inc., at 11. This argument has two branches, the first of which is the proposition that the jury verdict was not binding on the district judge because the elements of the legal claims decided by the jury are not the same as those of the equitable claims decided by the court. We must reject this argument, which is based on a misinterpretation of *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1443 (10th Cir. 1988).

On the particular facts in *Skinner*, we did say that in a "case under Title VII and § 1981 arising out of the same facts, the commonality of factual issues between the § 1981 and Title VII claims is nearly all-encompassing. The elements of each cause of action have been construed as identical." 859 F.2d at 1444. Therefore the verdict on § 1981 liability would normally be conclusive in a parallel Title VII claim. *Id*. However, the issue as we framed it in *Butler v. Pollard*, 800 F.2d at 224, is one of issue preclusion or collateral estoppel. Common elements of each cause of action, as were presented in *Skinner*, are not required for the doctrine to apply. Under issue preclusion principles, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue *in a suit on a different cause of action* involving a party to the first case." *Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1272 (10th Cir. 1995) (citing *Allen v. McMurry*, 449 U.S. 90, 94 (1980)).

---

[8]We note that this is in essence a harmless error argument.

The true test is whether the jury verdict by necessary implication reflects the resolution of a common factual issue. If so, the district court may not ignore that determination, and it is immaterial whether, as here, the district court is considering equitable claims with elements different from those of the legal claims which the jury had decided (as may often be the case). *See Butler v. Pollard*, 800 F.2d at 225-26.

Further developing its argument that no specific fact findings can be inferred from the jury verdict, Ag Services argues that the jury could have reached its disposition by accepting any of several defenses offered at trial by Nielsen. To evaluate this contention, we first proceed to examine the verdict in light of all the evidence presented.

We focus our analysis of the jury verdict on the distinction drawn by the jury on the conversion claims, finding DHFC – but not Nielsen – liable for conversion. The jurors were instructed to find Nielsen liable for conversion by DHFC if he "directed, controlled, approved or ratified the activity that led to the conversion." I Aplt. App. 341. Because the jury found Nielsen not liable for DHFC's conversion, the inference is unavoidable that the jurors concluded that Mr. Lundell, not Mr. Nielsen, was responsible for the conversion committed by DHFC. DHFC was owned fifty per cent by Nielsen and fifty per cent by Lundell, and Lundell ultimately controlled the Lundell Farms bank account into which almost all potato proceeds

were transferred.

We turn to Ag Services' contention that the general verdict does not necessarily imply any particular fact findings because of the assertion of multiple defenses at trial. Ag Services' argument fails because it has not demonstrated that any of the possible jury rationales it identifies would imply wrongdoing by Nielsen on which liability might have been properly based in equity. In short, any explanation for the jury's decision that Nielsen did not convert the Frito-Lay proceeds leads inexorably to the conclusion that the jury found no wrongdoing by Nielsen.

Thus although we have not found any specific factual findings which are necessarily implied by the jury verdict, we do find necessary inferences from the verdict indicating that certain views of the evidence were *not* taken by the jury as they could not have rationally supported the result. The most significant of these is that Nielsen did not participate in or ratify the conversion by DHFC. There remains the task of determining whether the trial judge's findings on the equitable claims may be reconciled with the verdict; we also must address other legal challenges to the district court's judgment.

**IV**

The district court held that Nielsen was liable to Ag Services under the doctrine of *quantum meruit* for some $323,353.72 (proceeds from the business) and

$89,000 (packing inventory). II Aplt. App. at 20. The New Mexico Supreme Court has recognized that the terms unjust enrichment, quasi contract and contract-implied-in-law are interchangeably used "to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between two parties regardless of their [lack of] assent thereto." *Hydro Conduit Corp. v. Kemble*, 793 P.2d 855, 861 (N.M. 1990) (quoting *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966)). The New Mexico high court has further said that "in such cases the simple but comprehensive question is whether the circumstances are such that equitably [the defendant] should restore to [the plaintiff] what [he] has received." *Allsup v. Space*, 367 P.2d 531, 537 (N.M. 1961) (citing *Atlantic Coast Line R.R. v. Florida*, 295 U.S. 301, 310 (1935)).

The judge found that Nielsen formed DHFC for the express purpose of impairing Ag Services' security interest in the potatoes. II Aplt. App. 414-15. There is impeachment evidence in the record tending to support this finding. III Aplt. App. 997-99. Nielsen was called as an adverse witness in Ag Services' presentation of its case. On direct examination by counsel for Ag Services, this exchange occurred:

> Q: [S]o you entered into the subleases and formed this business, so you didn't have to worry about Ag Services' security interest in Lundell's potatoes; isn't that right?

> A: No, you're saying the only reason I organized the business was to not worry about Ag Services' security interest, and, no, that's totally not right.

*Id*. at 998. Counsel for Ag Services then attempted to impeach Nielsen with this testimony he had earlier given in a deposition:

> Q: So you're saying in 1992 you thought this through, and you didn't worry about Ag Services' security interest because Lundell didn't own any of the potatoes?
>
> A: Well, yes, because that's the way – the reason we structured the business that way.

*Id*. at 999.

Thus, although there is some evidence to support the judge's finding, there is also evidence to the contrary. We think it plain that the jury did not find Nielsen formed the corporation in order to impair Ag Services' security interest because, if it had, it would have found that Nielsen had converted the Frito-Lay proceeds. Instead it found no conversion by Nielsen. Therefore, we must conclude that the district court should have applied issue preclusion because of the finding by the jury of no conversion by Nielsen. The court should have followed that jury finding and should have found that Nielsen did not form the corporation to impair Ag Services' security interest. The court erred by resolving this issue of fact contrary to the jury verdict from which issue preclusion applied.

The trial judge also found that Nielsen's receipt of the Frito-Lay proceeds ($323,352) and the packing inventory ($89,000) amounted to wrongful preferences, II Aplt. App. 418, ¶ 26, that is improper payments to a corporate insider in derogation of the rights of third-party creditors. Because unjust enrichment is a

remedy adaptable to many situations this conclusion could conceivably support the imposition of liability on the unjust enrichment theory.

The theory of wrongful preference serves to protect creditors of the corporation, however, and Ag Services was a creditor of Lundell, not DHFC. Thus, although Nielsen received the packing materials after knowledge that the corporation was insolvent, we still do not see how that converts Ag Services into a creditor of DHFC (instead of being a creditor of Lundell) which could invoke the wrongful preference doctrine. In short, within the limits we perceive were created by the jury verdict, we cannot find that there was anything inequitable in Nielsen's receipt of the Frito-Lay proceeds or the packing materials. Liability for unjust enrichment cannot be premised on the unsupported conclusion that Nielsen received a wrongful preference from DHFC.

Although liability may be imposed under the theory of unjust enrichment for conduct which does not constitute a tort or a breach of contract, *see Hydro Conduit Corp.*, 793 P.2d at 860, in the circumstances of this case, we believe any conduct by Nielsen on which liability for the Frito-Lay proceeds could be based would have amounted to conversion or negligent misrepresentation. The jury verdict, however, precluded the trial judge from finding that either of these occurred. In stating that he found the jury's verdict "erroneous" in finding no conversion by Nielsen, *see* note 5, *supra*, the trial judge in effect acknowledged that his findings were inconsistent

-17-

with the verdict. As we have explained, however the judge was bound by the verdict because he did *not* set it aside and order a new trial.

We have examined the trial judge's findings in a search for findings not precluded by the verdict which would support the judge's conclusion that liability should be imposed for unjust enrichment. Having discovered none, we must reverse the judgment insofar as it is based on this theory.

**V**

We also are persuaded by Nielsen's arguments that the judgment of the district court cannot be sustained on the theory of partnership by estoppel. Under the applicable statute in effect at the time, Ag Services could establish a partnership by estoppel either by showing that a representation of partnership was made directly to Ag Services and that it relied thereon in extending credit, or by showing that representations had been made so publicly that knowledge of the representations is implied by law without the necessity of any further proof. *See Cheesecake Factory, Inc. v. Baines*, 964 P.2d 183, 187 (N.M. Ct. App. 1998) (applying now repealed version of § 54-1-16). [9] For ease of discussion, we will refer to the two options respectively as the private representation and the public representation alternatives.

_____

[9]Effective July 1, 1997, New Mexico repealed its Uniform Partnership Act and adopted a revised version. Because the events at issue here occurred in 1991 and 1992, we deal with the former version of the act. N.M. Stat. Ann. § 54-1-16(A) (Michie 1978) (repealed).

-18-

Several of the findings and conclusions by the district judge were clearly intended to support the conclusion that Nielsen should be liable as a partner by estoppel. Therefore, we have carefully examined each of the relevant findings and conclusions. The district court apparently intended to base Nielsen's liability on both the private representation and the public representation types of partnership by estoppel, and Ag Services appears to argue in its brief that liability was correctly imposed under either branch of the estoppel doctrine.

As to liability based on private representations, Ag Services points to findings by the district judge that Ag Services had relied on representations, made to it by both Nielsen and Lundell, that Nielsen was "in business" with Lundell, and that Nielsen had acknowledged that the advances by Ag Services were "business obligations." *See, e.g.,* Findings of Fact and Conclusions of Law, II Aplt. App. 413 at ¶ 9; 419 at ¶¶ 33 & 34. These findings do not support the conclusion that Nielsen should be liable for Lundell's loan as a partner by estoppel because there is no finding that either man told Ag Services that they would be partners, nor is there a finding that Ag Services relied in any way on the belief that they would be partners. Indeed, the evidence, without contradiction, was that Ag Services did *not* believe that Lundell and Nielsen were partners. Instead, loan officer Knoploh testified, "Well, I don't think it was a partnership. It was – they were exchanging labor and equipment and this type of thing . . . ." II Aplt. App. 663. *See also id.* at 641-42;

676-77; 697 ("We were not looking at [Nielsen] to pay the loan.").

Ag Services did not require or expect Nielsen to participate as a partner, nor did it ask him to guarantee repayment of Lundell's loan, nor did it expect him to repay the loan. Ag Services was relying on Nielsen assisting Lundell, not on Nielsen's financial strength. This distinguishes the instant case from *Anderson Hay & Grain Co. v. Dunn*, 467 P.2d 5 (N.M. 1970), on which Ag Services now relies.

We are not aware of any case in which liability on the theory of partnership by estoppel has been imposed in the face of specific admissions by the creditor that it believed that the putative partners had some specific arrangement *other than* a partnership. We conclude that the district court erred in imposing liability based on representations that Nielsen would be "in business" with Lundell, when the undisputed evidence showed that Ag Services had a specific understanding that the relationship between the two was to be something other than a partnership.

We turn to the other alternative under the New Mexico statute, which involves representations of partnership made publicly. This category of partnership law in New Mexico was the subject of learned and respectful criticism by the intermediate appellate court of that state in the recent case of *Cheesecake Factory, Inc. v. Baines*, 964 P.2d 183, 186-190 (N.M. Ct. App. 1998). The particular point of controversy was whether a plaintiff asserting partnership by estoppel based on public representations not made to the plaintiff must prove reliance on the belief that a

partnership existed, as a plaintiff must do when asserting that a private representation of partnership was made directly to him. As one other court has noted, the notion that reliance should not be necessary in the public representation situation when it is necessary in the private representation situation is illogical. *National Premium Budget Plan Corp. v. National Fire Ins. Co* ., 234 A.2d 683, 729-732 (N.J. Super. Ct. Law Div. 1967), *aff'd*, 254 A.2d 819 (N.J. Super. Ct. App. Div. 1969). Nevertheless, forceful dictum from the New Mexico Supreme Court indicated that reliance need not be shown in a case based on public representations. *See Gilbert v. Howard*, 326 P.2d 1085, 1087 (N.M. 1958).

We believe that we must assume for purposes of this case that reliance is *not* required. Notwithstanding the force of the arguments in *Cheesecake Factory* and *National Premium*, we are bound by the considered dicta of the states' supreme courts as well as by their holdings; see Hawks v. Hamill, 288 U.S. 52, 58-59 (1933); Hardy Salt Co. v. Southern Pacific Transportation Co., 501 F.2d 1156, 1163 (10th Cir. 1974). We do not believe that it is our position to predict that the New Mexico Supreme Court would overrule its precedent in the complete absence of any indication *from that court* of its inclination to do so. [10]

Commenting on the public representation alternative for proving partnership

---

[10]We note that this is an issue unlikely to recur. That is because the Revised Uniform Partnership Act, since adopted in New Mexico, removes any doubt that reliance is required. *See* N.M. Stat. Ann. § 54-1A-308 (Michie 1999 Supp.).

by estoppel, the New Mexico Supreme Court has said that this doctrine

> extends liability beyond the common-law test of reliance so that when one has by his acts or his consent to the acts of others allowed or caused the general community to believe that he is a partner, then he is such by estoppel even though this particular creditor may not have heard the representation. . . . . However, *this test demands that the representations have been made in a "public manner" at the time that credit was extended so that at that time it was general community knowledge* even though the representations might not have been communicated to this particular creditor.

*Gilbert v. Howard*, 326 P.2d at 1087 (emphasis added). [1]

The district judge did not make an explicit finding that the general community had come to believe that Nielsen and Lundell were partners, but assuming that such a finding was implied, we see very little support in the evidence for it. We do note, however, that there was some evidence that trade creditors in the Clovis area may have believed that Nielsen and Lundell were partners. We will assume, for purposes of our analysis, that Lundell and Nielsen came to be viewed as partners by suppliers in the Clovis area during the course of the 1992 crop season, which we believe the evidence taken in the light most favorable to Ag Services established. This is insufficient to support the judgment, however, because the representations must have

---

[1]We note in passing that there has apparently been no effort to define the "general community" in this transaction between an Iowa lender (Ag Services), a borrower residing in Arizona or Utah when he was not in active military service (Lundell), and an alleged co-obligor living in Nebraska (Nielsen), all of whom were involved in farming in New Mexico. There is reason to doubt that the public representations identified by the trial court became "general community knowledge" in any community which included Ag Services.

been publicly made in the "general community" at the time that credit was extended. *See Gilbert* , 326 P.2d at 1087.  No evidence has been identified, and we have found none, which would establish that the representations had become public knowledge before credit was extended, nor did the district court make such a finding. Consequently Nielsen may not be held liable as a partner by estoppel.

## VI

We are also persuaded the district court erred in ruling that Nielsen was liable under the theory of piercing the corporate veil.  Piercing the corporate veil is an equitable remedy.   *See Scott v. AZL Resources, Inc.* , 753 P.2d 897, 900 (N.M. 1988); *Harlow v. Fibron Corp.* , 671 P.2d 40, 43 (N.M. Ct. App. 1983).  The effect of application of the doctrine is to hold a shareholder, officer or director personally liable for an obligation of the corporation.  Because the liability is derivative, the liability of the shareholder cannot exceed that of the corporation.   *See Eastridge Dev. Co. v. Halpert Assoc., Inc.* , 853 F.2d 772, 782 (10th Cir. 1988).  In the instant case, other than the jury's verdict on conversion, no liability of the corporate entity, DHFC, existed for which Nielsen could be held liable as it was Lundell's obligation to repay the loan.  The district court's findings and conclusions do not include any imposition of liability on the corporation,   *nor do they purport to find Nielsen liable for the jury verdict against DHFC* .

The second requirement for piercing the corporate veil is that the corporate

-23-

form was used for an improper purpose. The improper purpose must be that of the parent corporation or the shareholder against whom the remedy is sought. *See Scott v. AZL Resources*, 753 P.2d at 901; *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1053 (10th Cir. 1993) (applying federal law). The district judge clearly was of the opinion that Nielsen used the corporate form to perpetrate a fraud on Ag Services, as we noted in Part IV, *supra*. We are unable to reconcile that view of the evidence with the verdict of the jury, however. And, we note that the district court's findings rested largely on the informal manner of doing business, including financing the endeavor through loans from the principals in lieu of capitalization. Where undercapitalization is substantially a consequence of financing the business through loans rather than capital contributions, New Mexico cases have cautioned that "supplying money to a losing business does not constitute an improper purpose." *Scott v. AZL Resources*, 753 P.2d at 901; *see also Harlow v. Fibron Corp.*, 671 P.2d at 44.

We conclude that the judge's finding of improper purpose is irreconcilable with the jury verdict. Moreover, as we have noted, the district court erred by imposing on Nielsen as a shareholder a liability which was not a corporate liability. The judgment must be reversed insofar as it is based on this theory.

## Conclusion

We believe that the jury verdict in favor of Nielsen, in light of all the

particular circumstances of this case, precluded judgment against him on the equitable theories presented to the district court. We therefore hold that the judgment against defendant/appellant Nielsen must be reversed. On remand, the district court should enter judgment in favor of Nielsen on all claims. The judgment against DHFC is undisturbed, it having abandoned its appeal.