F I L E D
United States Court of Appeals
Tenth Circuit

JAN 6 2003

PATRICK FISHER
Clerk

PUBLISH

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

PALACE EXPLORATION COMPANY,

　　　Plaintiff - Appellant,

v.

PETROLEUM DEVELOPMENT
COMPANY,

　　　Defendant - Appellee.

No. 00-5118

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 98-CV-890-B)**

Fred M. Buxton of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, appearing for plaintiff - appellant.

Randall G. Vaughan (with J. Warren Jackman and John L. Randolph, Jr., on the brief) of Pray, Walker, Jackman, Williamson & Marlar, Tulsa, Oklahoma, for the defendant - appelee.

Before **LUCERO** and **McWILLIAMS**, Circuit Judges, and **STAGG,** District Judge.[*]

**STAGG**, District Judge.

---

[*]The Honorable Tom Stagg, United States District Judge for the Western District of Louisiana, sitting by designation.

Plaintiff-appellant Palace Development Company ("Palace"), holder of a fifty percent non-operating interest in an oil and gas prospect in Pittsburg County, Oklahoma, brought this action seeking rescission of the exploration agreement and the joint operating agreement that established its partnership in the well with defendant-appellee Petroleum Development Company ("PDC"). Palace's original complaint, filed in New York state court and sounding entirely in equity, sought restitution and rescission based on two theories: (1) fraud in the inducement relating to alleged misrepresentations of drilling methods and costs, and (2) failure of contract based on defendant-appellee's alleged failure to competently investigate subsurface conditions and the resulting movement of the well 1600 feet without notice. Approximately two weeks before trial commenced, Palace asserted within an Amended Pretrial Order a legal claim for breach of contract based on movement of the well without notice. The district court, however, refused to hear evidence of gross negligence, the basis for this claim. Focusing entirely on the rescission claims, the district court bifurcated the proceedings to try all rescission issues first, using an advisory jury and, if necessary, then hear evidence irrelevant to rescission for the purpose of adjusting the equities. The procedural path chosen by the court was dictated by an Oklahoma statute governing equitable disputes. The district court adopted the advisory jury's findings in favor of the defendant-appellees. Additionally, the court found that the jury's findings relating to the alleged misrepresentations and well movement foreclosed Palace's breach of contract claim. Plaintiff-appellant appeals the

2

district court's findings.

## I. BACKGROUND

PDC is an Oklahoma oil and gas exploration corporation, owned and managed by Dennis Ingram ("Ingram"), that operates and owns interests in a variety of oil and gas projects. In June of 1997, PDC developed plans to drill a well, the Rairdon No. 1-8 ("the Rairdon"), in Pittsburg County, Oklahoma. After evaluating the prospect, PDC contacted Palace, a New York-based oil and gas investor, about investing in the project. Additionally, PDC faxed Palace information on nearby wells, including two maps which described the location of the Rairdon site and an authority for expenditure ("AFE") estimating the cost of the well at $280,000. PDC arrived at this estimate by formulating a drilling plan analogous to one successfully implemented in drilling the Amoco-Henley well–a well drilled "on air" approximately one-half mile from the proposed site for the Rairdon. Air drilling is a technique by which compressed air forces drill cuttings from the well bore. When confronted with ground water, however, the slower and more expensive method involving the use of drilling mud must be implemented to remove the cuttings.

Approving the prospect, Palace executed a letter agreement with PDC. Under the terms of the agreement, each party took a fifty percent working interest in the Rairdon–that is, PDC and Palace agreed to share equally in profits and losses and cooperate in drilling the well. The letter agreement anticipated both an exploration

agreement and a joint operating agreement.

Soon after the letter agreement was executed, PDC determined that the initial geological information depicted in one of the maps sent to Palace was inaccurate. As a result, PDC decided to shift the well location approximately 1,600 feet in order to maximize the chances of hitting the target sand. PDC did not notify Palace of the relocation.

In the meantime, Palace forwarded the prospect information to its consultant and vice-president, Robert Zinke, for evaluation. Zinke advised Palace that, while the prospect had good potential, he believed that drilling could be complicated and that drilling mud would be required. In light of these potential complications and because using drilling mud is more expensive than drilling "on air," Zinke concluded that PDC had probably underestimated the potential costs in its original AFE. Palace called Ingram to discuss Zinke's assessment. During this conversation, Ingram informed Palace that PDC would drill the well "slow and straight," a statement which Palace claims to have interpreted as "drilling mud would not be required."

Subsequently, Palace executed an exploration agreement ("EA") and a joint operating agreement ("JOA") prepared by PDC. The JOA designated PDC as the operator of the contract area and provided that PDC, as operator, "shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as [o]perator to the other parties for losses sustained or liabilities incurred, except such as may result

4

from gross negligence or willful misconduct." The EA provided that the initial test well would be drilled "in the NW/4 of Section 8, Township 3 North, Range 16 East, Pittsburg County." The JOA provided that the well would be drilled "in a legal location in the W/2 of Section 8-T3N-R16E, Pittsburg County." Neither agreement provided for a more precise drilling location.

After drilling commenced, PDC encountered a water zone, which required PDC to abandon its plan to drill "on air." To continue drilling, PDC would have to use drilling mud, or "mud up." The well reached its final depth on November 6, 1997. Palace declined to participate in completion of the well. Palace's total investment in the well under the EA and the JOA was $378,057.93.

In December of 1997, Palace filed suit in the Supreme Court of New York, County of New York, seeking rescission of the EA and the JOA. In its original complaint, Palace asserted only two causes of action for rescission of these agreements. First, Palace claimed that PDC knowingly made numerous false representations in relation to the proposed AFE of $280,000 and that Palace relied on these representations. Second, Palace contended that PDC breached the agreement made between the parties. In its prayer, Palace requested that the court provide two forms of equitable relief. With regard to the first cause of action, Palace prayed for rescission of the JOA, as well as rescissionary damages. As to the second cause of action, the company sought to have the JOA rescinded and declared null and void. Palace did not articulate any theory of

5

recovery whereby it could recover legal damages based on breach of contract, for the above-referenced exculpatory clause limited PDC's potential liability to willful acts or acts that resulted from gross negligence.

PDC removed this action to the United States District Court for the Southern District of New York and moved to transfer venue to the United States District Court for the Northern District of Oklahoma. On November 13, 1998, the Southern District of New York transferred the matter to the Northern District of Oklahoma ("District Court") over Palace's objection. After the transfer, PDC answered with a general denial of the claims and asserted a counterclaim against Palace for breach of the exploration agreement. Palace generally denied PDC's counterclaim, which was eventually dropped.

Reflecting the complaint, an Agreed Pretrial Order was filed on September 9, 1999, in which Palace mapped out its intention to present claims for rescission. This pretrial order specifically stated, "Palace seeks rescission of the agreements based on alleged fraud in the inducement by PDC, and breach of the agreement by PDC." As remedies, Palace sought only a judgment rescinding the EA and JOA and providing restitution of the $378,057.93 in funds paid under the agreements. Listed as a factual issue to be litigated at trial was the following question: "Is Palace entitled to damages for PDC's breaches of contract and, if so, in what amount?" Palace also characterized the question whether PDC breached its duty to act as a prudent operator as a factual issue to be litigated at trial. Although both of these issues could be interpreted as a claim for legal

6

damages, the September 9th Agreed Pretrial Order did not clearly reference such a claim, nor did it sufficiently discuss Palace's entitlement to legal damages as a result of PDC's alleged gross negligence.

Consistent with the September 9th Agreed Pretrial Order is Palace's first trial brief, filed on September 20, 1999. Throughout the trial brief, Palace argued the merits of many of the issues raised in the Agreed Pretrial Order, but it did not expound upon PDC's failure to act as a reasonably prudent operator. Again, Palace did not raise the issue of gross negligence. In footnote 7 contained in the trial brief, Palace attempted to explain the applicable Oklahoma rescission law, Okla. Stat. tit. 15 § 233B ("Section 233B"). Section 233B allows the court to "grant damages or any other relief to which the party may be entitled, whether or not such relief is sought in the pleadings." Interpreting this section to preclude claims for legal damages, Palace argued to the trial court that "[n]o instruction on damages should be given, however, because, under Section 233B, the Court is to adjust the equities."

On September 24, 1999, PDC filed a motion for continuance and to reopen discovery based on Palace's failure to timely produce certain documents during discovery. That day, the district court ordered a continuance and reopened discovery. As a result, on November 19, 1999, a second pretrial conference was held to prepare for the trial scheduled to begin on December 6, 1999. At that pretrial conference, PDC expressed concern that Palace's claims were not acutely defined. PDC's concern was

7

likely attributable to the fact that Palace's expert had recently concluded that PDC was grossly negligent. Palace claimed in response that it alerted PDC to the existence of a gross negligence theory as early as December of 1997. Palace, however, never clearly articulated such a theory until the pretrial conference on November 19th. In fact, Palace did not obtain the expert testimony needed to support a gross negligence claim until discovery was reopened in late September of 1999. At the end of the conference, the trial court instructed the parties to outline the gross negligence issue in trial briefs.

On November 24, 1999, Palace filed several pleadings that altered its theories of recovery, as the November 19th pretrial conference had foreshadowed. In an amended trial brief, the company stated that it sought damages for breach of contract, based on PDC's alleged gross negligence, under Section 233B and in the alternative to the already familiar rescission claims. Also on November 24th, the parties filed an amended pretrial order, in which Palace, over objection by PDC, expounded on the gross negligence theory by stating that PDC breached the agreements as follows:

1. That PDC was grossly negligent in planning the drilling of the Rairdon Well by:

(a) preparing an Estimate of Costs and AFE for the drilling of the Rairdon Well

to casing point in the amount of $280,000; and

(b) moving the well location without informing Palace; and

8

2. That PDC failed to deliver all documents PDC was required to furnish to nonconsenting parties under the JOA as described in paragraph VI(B)(2) of the JOA.

A third pleading was filed on November 24th–PDC's motion to strike the breach of contract claim for legal damages. Palace responded on November 29, 1999, characterizing the motion as an attempt by PDC to deprive Palace of its right to a jury trial.

A final pretrial conference was held on December 3, 1999, just three days before the trial began. Without specifically ruling on PDC's motion to strike, the district court determined that Palace did not allege a breach of contract action at law; rather, it asserted only equitable claims for rescission, based on fraud in the inducement and failure of consideration. In reaching this conclusion, the court focused solely on the original complaint, effectively ignoring the pretrial conference held on November 19th, the pretrial order dated November 24th, and Palace's amended trial brief filed on November 24th. After framing the issues for trial, the district court next turned to the manner in which those issues would be presented. Specifically, the court interpreted the last sentence of Section 233B to require a bifurcation of the proceedings. Pursuant to the court's bifurcation plan, an advisory jury was to hear all of Palace's rescission claims. If the jury decided in favor of PDC, the court would then reopen the record to hear evidence not relevant to any of the rescission theories. Throughout both phases, the court was to sit

9

as a court of equity; thus, Palace's claims for legal damages based on gross negligence were excluded. Evidence of gross negligence would only be heard in phase two if the court deemed it relevant to an adjustment of the equities.

In accordance with the bifurcation plan established at the final pretrial conference, the case proceeded to trial before an advisory jury on December 6-8, 1999. At the conclusion of the evidence, Palace asserted a Rule 50 motion for judgment as a matter of law, which was denied. Thereafter, the advisory jury returned a verdict for PDC. On December 9, 1999, the trial judge entered an Order and Judgment adopting the jury's verdict in favor of PDC and directed the parties to brief the remaining contractual issues.

On February 14, 2000, the district court denied both a motion for summary judgment by PDC and another Rule 50 motion asserted by Palace. At a status conference on April 12, 2000, the district court held that, as a matter of law, the jury's determination of the well location issue necessarily decided the same issue in relation to the breach of the JOA. Palace moved for reconsideration of this decision and on May 17, 2000, the court denied this motion, finding that Palace had made an untimely request to allege a breach of contract action, which was not granted by the court except in the context of Section 233B. The parties filed a stipulation of dismissal with prejudice of Palace's remaining claims of breach of contract, and the court entered its final Order and Judgment on May 26, 2000. On June 6, 2000, Palace filed a notice of appeal. The specific issues in this appeal are discussed below.

## II.  **DISCUSSION**

Palace first argues that the district court abused its discretion in denying Palace the opportunity to raise a breach of contract claim for gross negligence on the eve of trial, except in the context provided for in the last sentence of Section 233B.  The district court effectively ruled that Palace was not entitled to present its legal breach of contract claims, for they were not pled in the original complaint.  Under Federal Rule of Civil Procedure 8(a)(2), a complaint is sufficient if it gives the defendant fair notice of the claims against him.  Palace argues that PDC was placed on notice of the possibility that it would raise a theory at trial under which it could recover legal damages.  Palace asserts that this notice was provided by the existence of a breach of contract element to its rescission claim and by the allegation in the initial Pretrial Order that PDC had not conducted itself as a prudent operator.  We disagree with Palace's contention that its complaint was sufficient to give PDC fair notice of the gross negligence claims against it.  We conclude, however, that the pretrial order filed on November 24, 1999, was sufficient to raise Palace's gross negligence claims, in light of Federal Rule of Civil Procedure 16(e) and our recent decision in Davey v. Lockheed Martin Corp., 301 F.3d 1204 (10th Cir. 2002).

Palace correctly points out that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, 'provided always that a late shift in the thrust of the

11

case will not prejudice the other party in maintaining his defense upon the merits.'"

Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991) (quoting 5 C.

Wright & A. Miller, Federal Practice & Procedure § 1219 at 194 (1990)).  Consistent with

this general rule is Federal Rule of Civil Procedure 16(e), which provides that a pretrial

order controls "the subsequent course of the action unless modified by a subsequent

order."  Rule 16's purpose, however, is "to avoid surprise, not foment it."  Wilson v.

Muckala, 303 F.3d 1207, 1216 (10th Cir. 2002).  Claims raised for the first time in a

pretrial order must be very carefully considered, to avoid deprivation of fair notice and to

avoid "abuse by those who employ a sporting theory of justice."  Id. at 1215.  Therefore,

we very cautiously examine whether the district court properly excluded evidence relating

to Palace's claim for legal damages.

We review a district court's decision to deny an amendment to a pretrial order for

an abuse of discretion.[1]  See Koch v. Koch Indus., Inc., 203 F.3d 1202, 1222 (10th Cir.

2000).  We consider the following issues when faced with a challenge to a district court's

exclusion of an issue: "(1) prejudice or surprise to the party opposing trial of the issue; (2)

the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient

trial of the case by inclusion of the new issue; and (4) bad faith by the party seeking to

modify the order."  Id. (citing Roberts v. Roadway Express, Inc., 149 F.3d 1098, 1108

---

[1] Although the district court entered the November 24 pretrial order, it impliedly denied the amendment contained therein when it looked only to the original complaint in assessing whether Palace sought legal damages for breach of contract.

12

(10th Cir.1998); Smith v. Ford Motor Co., 626 F.2d 784, 797 (10th Cir.1980)). This court also considers whether an amendment to the pretrial order was formally and timely requested. See id.

Turning to the first factor, any surprise or prejudice to PDC resulting from the new theory developed in the November 24 pretrial order would have been minimal. We recently explained that "the timing of the motion in relation to the commencement of trial is an important element in analyzing whether the amendment would cause prejudice or surprise." Davey, 301 F.3d at 1210-11. In Davey, the defendant sought an amendment to a pretrial order. The trial court disallowed the amendment, and we noted that trial could not have been disrupted, for the amended pretrial order was filed on the Friday before trial was to begin the following Monday. See id. at 1211. Allowing the amendment would have given PDC even more time to prepare for trial than existed in Davey. The amended pretrial order was filed approximately two weeks before trial was set to begin on December 6th. In addition, PDC was not first apprized of the gross negligence claims on November 24th. In the November 19th pretrial conference, PDC expressed concerns that Palace's gross negligence claims, having surfaced recently as a result of new expert testimony acquired when the district court reopened discovery, were not acutely defined. Thus, PDC had at least seventeen days of notice regarding the gross negligence claim.

Under the Northern District of Oklahoma's Local Rule 16.1(b)(1)(b), a final pretrial order must be filed with the court seven days before the pretrial conference. To

13

the extent Palace sought an amendment by filing the November 24th pretrial order, this amended pretrial order was timely. November 24th was the date on which the final pretrial order was due, pursuant to the district court's instructions. Furthermore, the November 24th pretrial order was filed more than seven days in advance of the final pretrial conference, which was held on December 3, 1999.

Our inquiry, however, does not end here. Looking at the second factor, PDC had ample ability to cure any potential prejudice. The <u>Davey</u> court noted that "Davey easily could have cured any prejudice or surprise by moving to continue the trial." <u>Davey</u>, 301 F.3d at 1211. Similarly, PDC complained at the November 19th pretrial conference that Palace had not acutely defined its gross negligence claim. It could have moved for a continuance at that time or at any time in the seventeen days that passed before the trial began.

Considering the third factor, inclusion of the gross negligence issue would not have disrupted the orderly and efficient trial of the case. Favorable to Palace is the <u>Davey</u> decision, in which this court explained that "if the motion to amend is made *prior* to trial, no disruption of an ongoing trial is threatened." <u>Davey</u>, 301 F.2d at 1212. Similarly, Palace amended the pretrial order almost two weeks prior to commencement of trial. Disruption of the trial did not occur. Furthermore, the claim for legal damages based on breach of contract arose from the same facts as the claims already alleged; thus any disruption to the trial preparation process was minimal.

14

The fourth and final factor under <u>Koch</u> is whether the party seeking to modify the pretrial order acted in bad faith. This court acknowledges that Palace waited until late in the litigation process to formally raise its breach of contract claim. The record indicates that Palace, as well as PDC, changed counsel during the pretrial period. It concludes, moreover, that Palace did not act in bad faith.

Eve-of-trial amendments that alter the course of litigation and, in this case, introduce a range of remedies not previously contemplated are, at times, not justifiable. Yet, in this case, the district court reopened discovery approximately two months before trial was scheduled to commence. The scope of this new discovery phase as defined by the court, moreover, was virtually unlimited, and it embraced the possibility of new issues surfacing. That the final pretrial order might contain a new or different legal theory was certainly foreseeable to the district court as early as September 24, 1999. It is surprising to us that the district court would allow new discovery to pursue additional issues but then, once such discovery was completed, deny the litigant the opportunity to litigate those additional issues.

Palace next argues that the district court abuse its discretion in severing its rescission claims from its breach of contract for gross negligence claim pursuant to the above-mentioned portion of Section 233B. This court will not overturn the district court's bifurcation of the issues unless its decision constituted an abuse of discretion. <u>See</u> <u>Anaeme v. Diagnostek, Inc.</u>, 164 F.3d 1275, 1285 (10th Cir. 1999). Bifurcation of issues

15

is sanctioned by Federal Rule of Civil Procedure 42(b) "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." "Bifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable." Angelo v. Armstrong World Indus., Inc., 11 F.3d 957, 964 (10th Cir. 1993) (citing O'Dell v. Hercules Inc., 904 F.2d 1194, 1202 (8th Cir.1990)). We find that the district court's interpretation of Section 233B was correct, and that the bifurcation plan was appropriate to give effect to Section 233B.

Section 233B applies to claims for rescission of a contract; it does not apply to claims for legal damages based on breach of contract. As discussed above, the last sentence of Section 233B provides, "[i]f the court determines that the contract may not be rescinded, it may grant damages or any other relief to which the party may be entitled, whether or not such relief is sought in the pleadings." This sentence gives effect to the statute's mandate that "the court shall adjust the equities between the parties." As stated by the Supreme Court of Oklahoma in Commercial Communications, Inc. v. Okla. Bd. of Pub. Affairs, 613 P.2d 473, 476 (Okla. 1980), "[t]he purpose for this rule is to leave nothing for future litigation which can be dispensed with by the court in the exercise of its *equitable* powers" (emphasis added). As a method of disposing of the equitable rescission claims in the case, the court's bifurcation plan was sound.

Section 233B, however, cannot be so applied when a claim for legal damages has been properly raised, as in the case presently before this court, namely because it contains

no provision for the adjudication of the legal claims by a jury.  Thus, Palace contends that

the district court's handling of the breach of contract for gross negligence claim deprived

it of its jury trial and due process rights.  As we have previously applied the Supreme

Court's seminal decisions in Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S. Ct. 894

(1962) and Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S. Ct. 948 (1959):

> The Seventh Amendment protects a party's right to a jury trial by ensuring that factual determinations made by a jury are not thereafter set aside by the court, except as permitted under common law. . . .  Thus, under the Seventh Amendment, the court may not substitute its judgment of the facts for that of the jury; it may only grant a new trial if it concludes that the jury's verdict was so against the weight of the evidence as to be unsupportable.
>
> The strictures of the Seventh Amendment are particularly applicable in a case where, due to the presence of both equitable and legal issues, trial is both to the jury and to the court. In such a situation, when a case involves both a jury trial and a bench trial, any essential factual issues which are central to both must be first tried to the jury, so that the litigants' Seventh Amendment jury trial rights are not foreclosed on common factual issues. Moreover, the court is bound by the jury's determination of factual issues common to both the legal and equitable claims.

Ag Services of America, Inc. v. Nielsen, 231 F.3d 726, 730 (10th Cir. 2000) (quoting

Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1442-43 (10th Cir.1988)).  In relation to

Palace's due process rights, it is well settled that a litigant is entitled to a fair trial, albeit

not a perfect one.  See Skaggs v. Otis Elevator Co., 164 F.3d 511, 515 (10th Cir. 1998)

(citing McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 553, 104 S. Ct. 845

(1984)).

We find that, in this case, Palace was deprived of its jury trial and due process

17

rights. Although the advisory jury heard ample evidence on the well relocation and certain misrepresentation issues–the issues underlying Palace's claim of breach of contract for gross negligence–an advisory jury is not the equivalent of a Seventh Amendment jury. See Fischer Imaging Corp. v. Gen. Elec. Co., 187 F.3d 1165, 1174 (10th Cir. 2001); see also Parkland Hosiery Co. v. Shore, 439 U.S. 322, 337 (1979). The issues underlying Palace's breach of contract for gross negligence claim were not litigated in accordance with the Seventh Amendment; therefore, we reverse and remand for a jury trial on Palace's legal breach of contract claim only.

Palace also contends that the district court erred by denying its motion for judgment as a matter of law. The trial court's denial of a Rule 50 motion for judgment as a matter of law is reviewed de novo. See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1268 (10th Cir. 2000). Judgment as a matter of law is appropriate "where the evidence and all inferences to be drawn therefrom are so clear that reasonable minds could not differ in the conclusion." Greene v. Safeway Stores, Inc., 98 F.3d 554, 557 (10th Cir. 1996).

At trial Palace asserted that it should be allowed to rescind its agreement with PDC based on allegations of fraud and failure of consideration. Palace's fraud claim is based on its argument that PDC committed constructive fraud by failing to disclose the change in the well location. Under Oklahoma law, a party may rescind a contract if that party's consent was secured by fraud. See Okla. Stat. tit. 15, § 233. Constructive fraud exists:

18

(1)    [i]n any breach of duty which, without an actual fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him, or

(2)    [i]n any such act or omission as the law specifically declares fraudulent, without respect to actual fraud.

Okla. Stat. tit. 15, § 59.

Palace asserts that the letter agreement executed between it and PDC established a fiduciary relationship between the parties and, as a result, PDC had a duty to inform Palace of the change in well location and to not misrepresent how it would go about drilling the well. While there is some question as to the nature of PDC's duty to Palace because of the letter agreement, the fundamental issue before the court is whether there was any misrepresentation on PDC's part. As discussed supra, the jury found in favor of PDC on both the well location issue and the AFE calculation issue, and the trial court ratified the jury's determination. Of note, the jury heard the testimony of expert Dobie Langenkamp, an oil and gas consultant who, among other things, has served off and on as a Deputy Assistant Secretary of the United States Department of Energy. Langenkamp testified that, as Deputy Assistant Secretary, he was recently involved in the privatization of the Naval Petroleum Reserve, specifically the sale of a significant reserve in Elk Hills California. Langenkamp also testified that at one time he served as a professor at University of Tulsa, where he taught a class entitled "oil and gas," which he described as "basically oil and gas leasing." Langenkamp testified that "the triangle [designating the planned location of the well on the structure map] is, for want of a better description, sort

19

of the initial starting point estimate of what the bottom hole location might be." Langenkamp also stated that "the diamond that's put on there is usually sort of very tentative and the ultimate location is a real head-scratcher, and . . . it's one of the last things done in a deal of this sort." Langenkamp explained that under oil and gas industry standards, while an operator is obligated to keep the nonoperator informed of material changes, "[i]n the final phase of fine-tuning a location, locations are almost always changed at the last minute and usually the nonoperator is not notified." Furthermore, he stated that the information that prompted the move was actually good news as it led to initializing the drill closer to the target sand.

Langenkamp also testified that he taught a course called "financing energy development." In relation to this course, he stated that "AFE's are always part of any petroleum development proposal." Regarding the AFE in question, he stated, "it was very consistent with practice. I thought it was good practice." On cross-examination, he stated that, while Palace's geology expert, Robert W. Von Rhee, had done an impressive regional study in relation to his testimony that PDC should have planned better, such a study exceeded the practice of ordinary operators "by a factor of many times." Langenkamp explained that "a regional study like Mr. Von Rhee's is generally interesting and so forth, but anybody that I know that would have drilled this well would have spent more time [looking at nearby wells]." Based on the evidence presented at trial, including the testimony of Langenkamp, the jury's conclusion was reasonable.

Palace's rescission claim for failure of consideration is based on the well location question. In Huffman v. Saul Holdings Ltd. P'ship,194 F.3d 1072 (10th Cir. 1999), we recognized that, under Oklahoma law:

> a party to a contract may rescind the same if through the fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part.... [P]artial failure of performance is ground for the rescission of a contract, when such failure defeats the object of the contract, or when it concerns a matter of such importance that the contract would not have been made if default in that particular had been expected or contemplated.

Id. at 1080-81 (quoting Berland's, Inc. of Tulsa v. Northside Village Shopping Ctr., Inc., 378 P.2d 860, 865 (Okla.1963) and Davis v. Gwaltney, 291 P.2d 820, 823 (Okla.1955)). Specifically, Palace argues that the initial geological maps were incorporated into the later agreements and that failure to abide strictly by these maps constituted a failure of performance. It is irrelevant whether or not this assertion is accurate. As stated above, Langenkamp testified that triangulation on initial geological maps is only an estimate as to where a well will ultimately be located. Therefore, the court properly denied Palace's Rule 50 motion on failure of consideration grounds.

Palace also argues that the district court abused its discretion by failing to retransfer this matter to New York. This court will not overturn such a decision unless it was a clear abuse of discretion. See Trierweiler v. Croxton and Trench Holding Corp., 90 F.3d 1523, 1543 (10th Cir. 1996). Title 28 United States Code section 1404(a) states, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been

21

brought." Although a few of the witnesses who testified at trial were located either in or near New York City, located in the Southern District of New York, most of the witnesses were located in or near Oklahoma. For instance, Palace's expert witness, Robert W. Von Rhee, has a business address in Tulsa, Oklahoma; PDC's drilling engineer, Robert J. Wurtzbacher, has a business address in Pocola, Oklahoma; Palace's vice-president and consultant Robert M. Zinke, of Zinke & Trumbo, Ltd., operates out of Tulsa; PDC's expert witness, Dobie Langenkamp, lives in Tulsa; and, although they testified by deposition, John Weber and Kevin Sayre both live in Fort Smith, Arkansas, which is located near the border of Oklahoma and Arkansas. Furthermore, as noted above, PDC is an Oklahoma corporation. From these facts, it would appear that the Northern District of Oklahoma in Tulsa was a more convenient venue than the Southern District of New York for the majority of the witnesses that testified at trial. As a result, the district court's denial of Palace's request to retransfer was not an abuse of discretion.

**REVERSED AND REMANDED.**